No. 14-1244

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

CAROLYN LEWIS
*Plaintiff-Appellant*

v.

ETHICON, INC. and JOHNSON & JOHNSON
*Defendants-Appellees*

_____

Appeal from the United States District Court for the Southern District
of West Virginia, Hon. Joseph R. Goodwin, District Judge
District Court Case No. 12-cv-04301, MDL No. 12-md-02327

_____

## BRIEF OF APPELLANT CAROLYN LEWIS

Adam S. Davis
WAGSTAFF & CARTMELL LLP
4740 Grand Ave., Suite 300
Kansas City, MO 64112
Phone: 816-701-1100
Fax: 816-531-2372
adavis@wcllp.com

Julie L. Rhoades
MATTHEWS & ASSOCIATES
2905 Sackett St.
Houston, TX 77098
Phone: 713-535-7172
Fax: 713-535-7132
jrhoades@thematthewslawfirm.com

## **CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellant Carolyn Lewis is an individual with no corporate affiliations.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. vi

JURISDICTIONAL STATEMENT .................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 3

STATEMENT OF THE CASE ........................................................................... 5

I.    The TVT device is a heavyweight, small-pore, mechanically cut mesh
      that has not been improved since coming onto the market in 1998. ....... 5

      A.   The history of the TVT ................................................................ 5

      B.   Complications with the TVT ........................................................ 7

      C.   Ethicon's resistance to change ................................................. 10

II.   Plaintiff Carolyn Lewis suffered from serious pelvic pain and
      dyspareunia after having the TVT device implanted in 2009 ................ 11

III.  Case history ................................................................................... 15

IV.   Orders from which appeal is taken ................................................ 17

SUMMARY OF THE ARGUMENT ................................................................ 18

ARGUMENT ................................................................................................. 22

I.    The trial court erred in granting a directed verdict on specific causation
      because Mrs. Lewis presented sufficient evidence that the TVT caused
      her injuries, regardless of whether she had to connect her injuries to a
      specific defect in the TVT. ........................................................... 22

**A. Standard of review**..................................................................**22**

**B. The treating physician's testimony that the TVT caused Mrs. Lewis's injuries was sufficient to create a question of fact for the jury.** ..........................................................................................**23**

    1. <u>Texas law does not require Plaintiff to connect her injuries to specific defects in the TVT.</u>............................................................23

    2. <u>Dr. Zimmern testified that the TVT caused Mrs. Lewis's pain, which is sufficient to establish specific causation under Texas law.</u>..........26

**C. Mrs. Lewis produced sufficient evidence from which a jury could conclude that specific defects in the TVT caused her pain.** ...............**28**

    1. <u>The trial court erred in requiring expert testimony that directly addressed the ultimate issue, rather than allowing for reasonable inferences by the jury.</u> ...................................................................28

    2. <u>A reasonable jury could have concluded that particular defects in the TVT caused Mrs. Lewis's injuries.</u>.................................................31

        a) *Plaintiff's evidence showed that the TVT's heavyweight, small-pore mesh caused degradation, scar tissue, and nerve entrapment, which caused her pain.*....................................32

        b) *Plaintiff offered evidence that the mechanically cut mesh of the TVT caused loose particles, which caused her pain.*......37

**II. The trial court committed reversible error by preventing Dr. Klinge from directly connecting his observations about the condition of Mrs. Lewis's mesh with her pain.** ................................................................**41**

**A. Standard of review**..................................................................**41**

**B. The trial court erroneously prevented Dr. Klinge from opining that the condition of the mesh was the cause of Mrs. Lewis's pain.** ........**42**

iii

C.  Dr. Klinge's stricken testimony provides an expert opinion on the ultimate issue, if this Court determines that such a statement is necessary. ...................................................................47

III.  The trial court erred in granting summary judgment on Mrs. Lewis's failure-to-warn claim because there was a genuine dispute of fact as to whether stronger warnings would have been passed on to Mrs. Lewis, causing her not to consent to the TVT surgery. ......................................49

A.  Standard of review...........................................................50

B.  An inadequate warning is a producing cause of a patient's injury if it prevents the physician from passing on warnings that would have caused the patient to refuse the medical device................................51

C.  There is a fact issue on causation, based on Dr. Boreham's testimony that she has a duty to convey warnings to the patient and Mrs. Lewis's testimony that she would have refused the device if she had been properly warned........................................................53

IV.  Under Texas law, design-defect plaintiffs in drug and medical device cases are not required to prove a safer alternative design......................56

A.  Standard of review...........................................................58

B.  When the Texas Legislature enacted Section 82.005, there was no requirement that a design-defect plaintiff prove a safer alternative design.................................................................58

C.  Through Section 82.005(d), the Legislature expressed a clear intent to exempt drug and device cases from the new requirement of proving a safer alternative design......................................61

D.  The Texas Supreme Court has not addressed this issue, and none of the case law contrary to Plaintiff's position has analyzed the issue at all ...........................................................................63

CONCLUSION ......................................................................66

CERTIFICATE OF COMPLIANCE .............................................68

**CERTIFICATE OF SERVICE**........................................................................**69**

**ADDENDUM INDEX**..................................................................................**70**

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

**U.S. Court of Appeals:**

*A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630 (7th Cir. 2001)........................44

*Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001)...................................................22

*Fontenot v. Taser Int'l Inc.*, 736 F.3d 318 (4th Cir. 2013)....................................63

*Fussman v. Novartis Pharmaceuticals Corp.*, 509 Fed. App'x 215 (4th Cir. Feb. 8, 2013) ...........................................................................................................................52

*Glynn v. EDO Corp.,* 710 F.3d 209 (4th Cir. 2013)................................................50

*Goodner v. Hyundai Motor Co.*, 650 F.3d 1034 (5th Cir. 2011).....19, 28-30, 36, 40

*Kennedy v. Joy Techs., Inc.*, 269 Fed. App'x 302 (4th Cir. March 12, 2008).........46

*Levy v. Lexington County, S.C.*, 589 F.3d 708 (4th Cir. 2009)........................50, 56

*Magyar v. United Fire Ins. Co.*, 811 F.2d 1330 (9th Cir. 1987) ...........................47

*McNeil v. Wyeth*, 462 F.3d 364 (5th Cir. 2006)................................................ 51-52

*Pliler v. Stearns*, 747 F.3d 260 (4th Cir. 2014).....................................................58

*Porterfield v. Ethicon, Inc.*, 183 F.3d 464 (5th Cir. 1999) ...................................51

*Sales v. Grant*, 158 F.3d 768 (4th Cir. 1998)...........................................22, 23, 49

*Turner v. United States*, 736 F.3d 274 (4th Cir. 2013) ................................... 50-51

*United States v. Cole,* 631 F.3d 146 (4th Cir. 2011)..............................................41

*United States v. Mason,* 52 F.3d 1286 (4th Cir. 1995)...........................................41

*United States v. Panza*, 612 F.2d 432 (9th Cir. 1979)...........................................47

*United States v. Sriyuth*, 98 F.3d 739 (3d Cir. 1996) ................................. 41-42, 47

*United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394 (4th Cir. 2012) ..................................................................................50, 56

**Federal District Courts:**

*Ackermann v. Wyeth Pharms.*, 471 F. Supp. 2d 739 (E.D. Tex. 2006)...................52

*Bigelow v. New York Lighter Co.*, 2005 US Dist. LEXIS 47871 (W.D. Tex. June 27, 2005) ........................................................................................ 24-25

*Guenther v. Novartis Pharm. Corp.*, No. 6:80-cv-456-Orl-31DAB, 2013 WL 1498162 (M.D. Fla. April 9, 2013) .................................................52

*Holt v. Globalinx Pet, LLC*, No. SACV13–0041 DOC, 2013 WL 3947169 (C.D. Cal. July 30, 2013) ...................................................................................28, 30

*Rojas v. Teva Pharms. USA, Inc.*, 920 F. Supp. 2d 772 (S.D. Tex. 2013)..............64

**Texas Supreme Court:**

*Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997) .................... 24-26

*Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex. 1980) ................. 58-60

*Caterpillar v. Shears*, 911 S.W.2d 379 (Tex. 1995) ...............................................60

*General Motors Corp. v. Sanchez*, 997 S.W.2d 584 (Tex. 1999)...........................31

*Gladewater v. Pike*, 727 S.W.2d 514 (Tex. 1987) .................................................28

*Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608 (Tex. 1996).....................24

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007)...............................23, 55

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572 (Tex. 2006) ...................................23

*Owens-Corning Fiberglas Corp. v. Caldwell*, 818 S.W.2d 749 (Tex. 1991) .........60

*State v. Shumake*, 199 S.W.3d 279 (Tex. 2006)......................................................62

*Texas Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170 (Tex. 2004) ........................................................................61

*Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex. 1979)............................60

**Texas Court of Appeals:**

*Att'y Gen. of Texas v. Farmers Ins. Exchange*, 411 S.W.3d 139 (Tex. App.–Austin 2013) ........................................................................62

*Brockert v. Wyeth Pharms., Inc.*, 287 S.W.3d 760 (Tex. App.–Houston 2009) .....64

*Kia Motors Corp. v. Ruiz*, 348 S.W.3d 465 (Tex. App.–Dallas 2011) ..................31

*Merck & Co., Inc. v. Garza*, 277 S.W.3d 430 (Tex. App.–San Antonio 2008), *overruled on other grounds by Merck & Co., Inc. v. Garza*, 347 S.W.3d 256 (Tex. 2011) ........................................................................64

*Royal Globe Ins. Co. v. Suson*, 626 S.W.2d 161 (Tex. App. 1981).......................23

*Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724 (Tex. App.–Dallas 1992)........................................................................25, 59

*Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685 (Tex. App.–Houston 2010) ........................................................................24

<u>**Statutes**</u>

**Federal:**

28 U.S.C. § 1332........................................................................ 1

28 U.S.C. § 1407........................................................................ 1

28 U.S.C. § 1291........................................................................ 1

**State:**

Tex. Civ. Prac. & Rem. Code § 82.005 ............... 3, 21, 23-25, 31, 57-58, 61-62, 64

## Rules

Federal Rule of Civil Procedure 50(a) ..................................................... 1, 3, 18, 22

Federal Rule of Appellate Procedure 4(a)(1)(A) ................................................... 1

Federal Rule of Civil Procedure 54(b) ................................................................ 55

Federal Rule of Civil Procedure 56(a) ................................................................ 50

## Secondary Sources

Restatement (Second) Torts § 402A ................................................................... 24

Jeffrey Diamant, *Texas Senate Bill 4: Product Liability Legislation Analyzed*, 31 HOUS. L. REV. 921 (1994) ....................................................................... 64-65

TXPG-PI § 4:348 ........................................................................................... 65

## <u>JURISDICTIONAL STATEMENT</u>

(A): The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are diverse, and the amount in controversy is greater than $75,000.[1]  Plaintiff-Appellant Carolyn Lewis and her husband, Kenneth— formerly a Plaintiff—are Texas residents, while all Ethicon Defendants are New Jersey residents.[2]  The case was filed in the Northern District of Texas, then transferred to the Southern District of West Virginia under 28 U.S.C. § 1407.[3]

(B): This Court has jurisdiction under 28 U.S.C. § 1291.  Plaintiff-Appellant Carolyn Lewis is appealing from a final judgment against her.  The district court issued a severance order dismissing all Plaintiffs other than Carolyn and Kenneth Lewis.[4]  Later, the parties jointly dismissed Mr. Lewis.[5]  Thus, Carolyn Lewis is the sole remaining Plaintiff.  After she presented her evidence, the trial court granted judgment to the Defendants pursuant to Rule 50(a).[6]

(C): This Court's first Order granting judgment to Defendants was issued on February 18, 2014.[7]  Mrs. Lewis filed notice of appeal on March 18, 2014.  Thus, the appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

---

[1] App. Vol. I at 53, ¶ 12.
[2] *Id.* at 52-53, ¶¶ 7-10.
[3] *Id.* at 81-82.
[4] *Id.* at 84-87.
[5] App. Vol. VI at 2446.
[6] App. Vol. XII at 4987-88.
[7] *Id.* at 4987.

(D): The appeal is from a final judgment disposing of all claims against all parties.

## STATEMENT OF THE ISSUES

1.      On a Rule 50 motion, the jury may draw reasonable inferences from the evidence.  Plaintiff's treating physician testified that the TVT mesh device injured her, and other experts connected her injuries to specific defects in the TVT—its heavy weight and small pores, and its mechanically-cut edges.  Did the district court err in dismissing the case on the issue of specific causation?

2.      The district court sustained objections and struck testimony by Dr. Uwe Klinge, an expert who explained various problems that he discovered in examining the mesh explanted from Mrs. Lewis.  Some testimony was stricken without objection.  As a result, Dr. Klinge was unable to expressly connect his observations with Mrs. Lewis's pain.  Did the district court err in excluding the testimony?

3.      On a summary judgment motion, all reasonable inferences should be given to the non-moving party.  The district court dismissed Plaintiff's failure-to-warn claim for lack of causation, even though the implanting physician had read the TVT Instructions for Use, and even though Mrs. Lewis testified that, had her physician given her stronger warnings, she would not have agreed to the TVT surgery.  Did the district court err in granting summary judgment?

4.      Section 82.005(d) of the Texas Civil Practices & Remedies Code exempts plaintiffs in drug and medical device cases from the statute's requirement

that plaintiffs alleging design defects prove a safer alternative design.  The district court required Mrs. Lewis to prove a safer alternative design in her medical device case, which arose under Texas law.  Should Mrs. Lewis be required to prove a safer alternative design if this case is re-tried?

## STATEMENT OF THE CASE

I. **The TVT device is a heavyweight, small-pore, mechanically cut mesh that has not been improved since coming onto the market in 1998.**

### A. The history of the TVT

In 1998, Ethicon, Inc. ("Ethicon"), a division of Johnson & Johnson, brought to market a new product called the "TVT," which stands for "tension-free vaginal tape."[8]  The TVT is a midurethral sling that is designed to treat stress urinary incontinence ("SUI").[9]  SUI "is a medical condition where a woman will lose her urine during periods of increased pressure in the abdomen, such as coughing, sneezing, laughing, or exercise."[10]  The TVT is made from knitted polypropylene.[11]

Ulf Uvar Ulmsten, a Swedish professor, invented the TVT.[12]  On February 13, 1997, Johnson & Johnson entered into a license and supply agreement with Professor Ulmsten's company, Medscand, allowing Johnson & Johnson to market and sell what would become the TVT product.[13]  The contract called for Johnson & Johnson to make scheduled $200,000 payments for the device.  It also required a $400,000 payment to Professor Ulmsten for completing a clinical trial—but only if the results of that clinical trial were sufficiently identical to the results of a trial that

---

[8] App. Vol. VI at 3064 (87:1-6); *id.* at 2760 (64:2-5).
[9] *Id.* at 2752-53 (56:17-57:1).
[10] *Id.* at 2732 (56:13-16).
[11] *Id.* at 2768 (72:14-18).
[12] *Id.* at 3072 (237:14-238:16); App. Vol. X at 4195.
[13] App. Vol. X at 4145.

5

Professor Ulmsten had published in 1996.[14]  Thus, Johnson & Johnson would pay

Professor Ulmsten only if his studies achieved particular safety and efficacy

results.[15]  Rick Isenberg, a former medical director at Ethicon,[16] testified that

Professor Ulmsten's financial stake in the outcome casts doubt on the impartiality

of the studies.[17]

In November 1999, Johnson & Johnson entered into an asset purchase

agreement to take full ownership of the TVT.[18]  The total cost was $24,525,000.[19]

Johnson & Johnson also agreed to various payments to Professor Ulmsten himself,

totaling at least $2,281,000, on top of his share as part-owner of Medscand.[20]

Professor Ulmsten agreed to assist with additional clinical trials.[21]

Eventually, Ethicon began receiving complaints about the TVT.  Dr. Meng

Chen, who began as Ethicon's associate medical director of risk management,[22]

was responsible for reviewing complaints from patients.[23]  Among the

complications she observed were vaginal discharge, vaginal bleeding, dyspareunia

---

[14] *Id.* at 4192; App. Vol. VII at 3064-66 (102:9-14, 110:14-112:23).

[15] App. Vol. VII at 3066 (113:24-114:10).

[16] *Id.* at 3044 (318:7-10).

[17] *Id.* at 3051 (433:8-20, 435:4-6).

[18] *Id.* at 3069 (207:22-208:6); App. Vol. X at 4218.

[19] App. Vol. VII at 3070 (213:8-15).

[20] *Id.* at 3074 (272:24-273:5).

[21] *Id.* at 3071-72 (233:5-18).

[22] App. Vol. VIII at 3230 (24:20-23).  Dr. Chen's title changed several times.  She is now the "associate medical director of postmarket surveillance center of excellence."  *Id.* at 3231 (25:12-15).

[23] *Id.* at 3232 (42:3-19).

(painful sex), sexual dysfunction, recurrent prolapse, mesh erosion, and voiding complications.[24] She found "a number" of cases of dyspareunia in Ethicon's database of adverse reactions.[25] She acknowledged that the TVT did not always provide the "quick and easy" solution that patients expected.[26] In fact, some patients stated that their lives had been ruined.[27]

In a report, Dr. Chen wrote that "patients did not feel there were adequate preop consent or risk-benefit assessment."[28] She testified that subsequent versions of the TVT, known as the TVT-O and the TVT-S, were "safer and more effective version[s]" of the original TVT.[29]

## B. Complications with the TVT

The TVT is made from the "old-construction" Prolene mesh originally used for hernia repair in the 1970s.[30] It is a heavyweight mesh with small pores.[31] Around the time that the TVT came to market, Drs. Bernd Klosterhalfen and Uwe Klinge at Aachen University in Germany—both of whom testified as experts at trial—developed a lightweight, large-pore mesh for Ethicon, for use in hernia

---

[24] *Id.* at 3233 (107:4-109:4).
[25] *Id.* at 3240 (167:15-168:1).
[26] *Id.* at 3243 (226:4-12).
[27] *Id.* at 3245 (267:2-13).
[28] *Id.* at 3238 (124:11-14).
[29] *Id.* at 3231 (34:11-17).
[30] *Id.* at 3296 (37:14-21), 3301 (70:24-71:5).
[31] *Id.* at 3296 (40:12-15), 3299 (62:21-63:1).

repairs.[32]  This "Vypro" product hit the market in 1998.[33]  But Ethicon's TVT is still the "old construction" heavyweight, small-pore mesh.[34]

As compared with a lightweight, large-pore mesh, the TVT's heavyweight, small-pore mesh has several deficiencies.  For instance, small-pore meshes produce a greater inflammatory response,[35] and produce much more scar tissue.[36]  That scar tissue causes shrinkage of the mesh during the healing process.[37]  The scar tissue can then entrap nerves, causing chronic pain.[38]  In addition, lightweight meshes have better tissue integration, with less foreign body reaction.[39]  Dr. Bruce Rosenzweig, a urogynecologist, testified that upon explanting the TVT from patients suffering from complications, he would see that the TVT "looked smaller, narrower, shrunken, if you will, and there were other times where the mesh was cracked, it was broken, and, for lack of a better term, it looked beaten up."[40]

Ethicon employees noted this deformity.  Dr. David Robinson worked as a physician implanting the TVT and later became Ethicon's Worldwide Medical

---

[32] App. Vol. VI at 2647 (20:11-21:15).
[33] *Id.* at 2648 (22:5-18).
[34] App. Vol. IX at 3682 (986:13-23).
[35] App. Vol. VI 2650 (28:21-29:07).
[36] *Id.* at 2663 (82:20-83:8).
[37] *Id.* (83:12-84:06).
[38] *Id.* at 2665 (88:16-89:15).
[39] *Id.* at 2654 (41:05-42:20).
[40] App. Vol. VII at 2767 (71:6-9).

8

Director.[41]  An article produced from Dr. Robinson's files stated that midurethral slings coming to market after the TVT "have been altered as a marketing strategy to overcome clinician-perceived deficiencies in the TVT."[42]  Further, "the mesh easily deforms under tensioning under the urethra."[43]

Another issue with the TVT was that mechanically cutting the mesh causes frayed edges and particle loss.  Dr. Rosenzweig described mechanical cutting as "like taking a paper cutter and cutting the segments of mesh, or a guillotine device is maybe a better way of putting it."[44]  Ethicon discovered early on that mechanically-cut mesh would rope and curl upon insertion.  In 2004, a series of Ethicon e-mails discussed how the mesh was prone to roping and fraying, stating that "the root cause of this phenomenon [sic] are known: the way to cut the mesh (blade cutting)."[45]  Thus, the author stated that Ethicon could "limit the mesh fraying defect significantly" by cutting the mesh ultrasonically or with a laser.[46]  In 2006, Ethicon engineer Gene Kammerer advocated for laser-cutting the mesh.  He wrote that laser-cut mesh would decrease fraying, particle loss, roping, and permanent narrowing of the mesh.[47]

---

[41] App. Vol. VIII at 3425-26 (13:23-14:1, 25:1-23).
[42] *Id.* at 3444 (1063:3-10).
[43] *Id.* (1063:10-13).
[44] App. Vol. VII at 2757 (61:19-22).
[45] App. Vol. VIII at 3413 (13:3-8).
[46] *Id.* (13:9-14).
[47] *Id.* at 3258 (214:1-23).

Still, Ethicon continued to sell the mechanically cut mesh that roped, frayed, and lost particles. Ethicon laser-cuts its TVT-Secur product, but it continues to cut the TVT by machine.[48] Thus, Ethicon continued to sell the same TVT mesh despite knowing that "it had the potential for degradation, particles floating around in women's bodies, stretching, and roping."[49]

### C. Ethicon's resistance to change

In 2007, Ethicon began a program called "Scion," intending to develop "a next generation of a TVT product."[50] The project leader was Dan Smith, who has worked for Ethicon since 1977.[51] However, the Scion program did not develop a new product.[52] When asked why the Scion program had been scrapped, Mr. Smith testified that it was "[b]usiness reasons. The company decided not to pursue the direction of Scion."[53] The issue was not the cost, Mr. Smith added, but "just direction of where the company wanted to focus their efforts."[54]

Dr. Axel Arnaud joined Ethicon in 1992,[55] and he visited Professor Ulmsten to evaluate the invention that would become the TVT.[56] When asked why the TVT

---

[48] *Id.* at 3257 (202:23-203:15).
[49] *Id.* at 3415 (30:18-24).
[50] *Id.* at 3460 (490:2-6).
[51] *Id.* at 3455 (12:6-7), 3460 (490:7-10).
[52] *Id.* at 3460 (491:4-5).
[53] *Id.* (491:6-8).
[54] *Id.* (491:9-13).
[55] App. Vol. IX at 3653 (868:17-19).
[56] *Id.* at 3655 (876:22-877:11).

10

has never changed, Dr. Arnaud responded that "I've always heard people in Gynecare [a division of Ethicon] resisting to any changes for a simple reason, is because we have a lot of clinical data generated with the genuine TVT … ."[57] After new competitors came onto the market, Ethicon "had a chance to be the only company having strong clinical data."[58]  Thus, marketing was the driving force behind Ethicon's decision not to alter the TVT, despite its flaws.[59]

## II.  Plaintiff Carolyn Lewis suffered from serious pelvic pain and dyspareunia after having the TVT device implanted in 2009.

Plaintiff Carolyn Lewis was born in Portsmouth, Virginia, on May 30, 1954.[60]  At age 6, she moved to Texas.[61]  After graduating high school, Mrs. Lewis took a variety of jobs, including working at a bank.[62]  She then went to work for TU Electric, which operated a coal mine in Fairfield, Texas.[63]  At the coal mine she met Kenneth Lewis, who became her husband.[64]  They were married in October 1982, and they remain married today.[65]  Carolyn and Kenneth Lewis now live in

---

[57] *Id.* at 3578 (568:8-11).

[58] *Id.* (568:19-23).

[59] *See* App. Vol. VIII at 3499 (120:20-121:11) (former Ethicon project leader Brigitte Hellhammer agreeing that in the company decided not to change the TVT "at least in part" due to "the Scandinavian studies by Ulmsten and the Uppsala group").

[60] *Id.* at 3337 (30:17-20).

[61] *Id.* (30:21-24).

[62] *Id.* at 3338 (31:9-15).

[63] *Id.* (31:16-19).

[64] *Id.* (31:24-25).

[65] *Id.* at 3339 (32:3-4), 3395 (88:14-15).

rural Corsicana, Texas.[66] Mr. Lewis is a military veteran and a truck driver.[67] Mrs. Lewis testified that she and her husband had a "very active sex life" before the TVT surgery.[68]

During the 1990s, Mrs. Lewis developed SUI. It got progressively worse over time.[69] Eventually, she spoke with a friend who gave her the name of a physician, Dr. Muriel Boreham.[70] Mrs. Lewis went to see Dr. Boreham, who performed a series of tests.[71] She diagnosed Mrs. Lewis with SUI and showed her how she could treat the condition with tape to hold up her urethra.[72] Dr. Boreham did not warn Mrs. Lewis that the TVT might cause dyspareunia, permanent nerve pain, and other permanent pain, or that she might need further surgery to remove the mesh.[73] Mrs. Lewis would have declined the surgery had she been warned of these dangers.[74] None of these risks are warned of—explicitly or implicitly—in the TVT Instructions for Use ("IFU").[75]

---

[66] *Id.* at 3344 (37:2-3).

[67] *Id.* at 3396-99 (89:10-90:5, 91:11-92:21).

[68] *Id.* at 3348 (41:9-12).

[69] *Id.* at 3339 (32:34-33:6).

[70] *Id.* at 3340-43 (33:15-34:2, 36:23-24).

[71] *Id.* at 3344 (37:6-22).

[72] *Id.* at 3344-45 (37:23-38:7).

[73] App. Vol. V at 2021.

[74] *Id.*

[75] *Id.* at 1930-36.

In October 2009, Dr. Boreham implanted the TVT in Mrs. Lewis.[76] Six weeks after the surgery, Mrs. Lewis returned to Dr. Boreham for a routine check-up. At that time, Dr. Boreham said that Mrs. Lewis "was healing" and "was good to go."[77] So, the Lewises attempted to resume their intimate life that night. But it was painful, so they stopped.[78] Three or four weeks later, the pain was still there when they attempted sexual relations.[79] Mrs. Lewis also developed pelvic pain that would come and go. She testified that "[a]ny twisting motion would set it off."[80] Mrs. Lewis found herself "not wanting to sweep the floor, not wanting to load wood in the fireplace."[81]

Eventually, in May 2013, Mrs. Lewis went to see a new physician, Dr. Philippe Zimmern.[82] Dr. Zimmern evaluated whether he should remove part of the TVT.[83] Dr. Zimmern examined Mrs. Lewis and considered her symptoms, the operative note from Dr. Boreham, and her test results.[84] He explained the risks and benefits of explant surgery to Mrs. Lewis, and she decided to have the procedure

---

[76] App. Vol. VIII at 3346 (39:17-22).

[77] *Id.* at 3348 (41:21-24).

[78] *Id.* at 3349 (42:3-8).

[79] *Id.* (42:9-11).

[80] *Id.* at 3350 (43:1-11).

[81] *Id.* at 3351 (44:4-10).

[82] App. Vol. IX at 3687 (10:13-19).

[83] *Id.* (11:22-12:2).

[84] *Id.* at 3708 (94:19-23).

13

done.[85]  As part of his examination, Dr. Zimmern determined that the TVT was the cause of Mrs. Lewis's pain and dyspareunia.[86]  Specifically, the portion of the TVT under the urethra was causing her pain.[87]  Dr. Zimmern performed the explant surgery on September 10, 2013, removing only the suburethral segment of the TVT.[88]

The mesh explanted from Mrs. Lewis was seriously cracked and degraded.[89] The mesh also contained scar tissue, and microscopic images of Mrs. Lewis's mesh revealed entrapped nerves in that scar tissue.[90]  Images of her mesh also showed a loose particle, likely from fraying of the mechanically cut mesh.[91]

Since the explant surgery, Mrs. Lewis's pain has decreased, and her life has normalized.  She can sweep and mop the floor, and she can split wood for the fireplace.[92]  She said that a twisting motion still brings back the pain at times, but "it's nothing like it was."[93]  The decrease in pain since the explant surgery has also allowed Mrs. Lewis to resume an intimate relationship with her husband.[94]  They

---

[85] *Id.* at 3713 (111:10-22).
[86] *Id.* at 3708 (95:9-18).
[87] *Id.* at 3709 (98:5-11).
[88] *Id.* at 3714 (113:21-114:1), 3716 (120:1-8).
[89] App. Vol. VII at 2935-38 (56:25-57:9, 59:15-25).
[90] App. Vol. VIII at 3160 (77:11-20), 3169 (86:4-18).
[91] *Id.* at 3167 (84:7-13).
[92] *Id.* at 3368 (61:6-20).
[93] *Id.* (61:21-24).
[94] *Id.* at 3368-69 (61:25-62:7).

are able to be spontaneous in a way that was not possible with the TVT.[95]  Mrs.

Lewis said that she can do all activities that she was able to do before having the

TVT implanted.[96]

## III.    Case history

Mrs. Lewis filed this case on July 25, 2012, in the U.S. District Court for the

Northern District of Texas.[97]  The case was then transferred to MDL No. 12-2327,

*In re: Ethicon, Inc. Pelvic Repair System Products Liability Litigation*, in the

Southern District of West Virginia.[98]  Mrs. Lewis's complaint, which also named

Kenneth Lewis as a plaintiff, included eight counts.[99]  Defendants filed a motion

for summary judgment.[100]  The trial court granted summary judgment on Plaintiffs'

failure-to-warn claim, their two breach-of-warranty claims, and their

manufacturing defect claim.[101]  Plaintiffs later dismissed Kenneth Lewis as a

Plaintiff, removing his loss-of-consortium claim.[102]  Thus, Mrs. Lewis took three

claims to trial: strict liability-design defect, negligence, and punitive damages.[103]

---

[95] *Id.* at 3369-70 (62:20-63:2).
[96] *Id.* at 3369 (62:16-18).
[97] App. Vol. I at 51.
[98] *Id.* at 81-82.
[99] *Id.* at 51, 66, 70-72, 74-77.
[100] *Id.* at 88.
[101] App. Vol. V at 2185, 2189-92.
[102] App. Vol. VI at 2446.
[103] App. Vol. V at 2189, 2192, 2194.

Mrs. Lewis presented testimony from Drs. Klosterhalfen, Rosenzweig and Klinge; from another expert, Dr. Howard Jordi; and from Dr. Zimmern, the explanting physician. She also presented testimony by deposition from numerous current and former Ethicon employees. After the first week of trial, the court asked the parties to brief issues related to a possible directed verdict.[104] The parties complied with that request, and with a request for supplemental briefing.[105]

The trial resumed the following Tuesday. Plaintiff formally rested,[106] and then Defendants moved for judgment as a matter of law.[107] The court heard argument and then read its ruling.[108] The court granted Defendants' motion for a directed verdict on the design-defect claim and on the negligence claim, leaving no underlying claim for possible punitive damages. The court held that Plaintiff had failed to establish specific causation.[109] The court entered formal orders on February 18, 2014, and February 19, 2014, granting judgment as a matter of law.[110] On March 18, 2014, Plaintiff filed notice of appeal.[111]

---

[104] App. Vol. VIII at 3407-08 (100:25-101:10).

[105] App. Vol. IX at 3820 (23:1-6).

[106] *Id.* at 3819 (22:19).

[107] *Id.* at 3820 (23:7-12).

[108] *Id.* at 3820-60.

[109] *Id.* at 3859-60 (62:10-63:15).

[110] App. Vol. XII at 4986-87.

[111] *Id.* at 4988-89.

## IV.  Orders from which appeal is taken

Plaintiff respectfully requests that this Court reverse the following district court orders:

- The orders granting judgment as a matter of law to Defendants.[112]

- The rulings sustaining objections and striking certain testimony by Dr. Klinge, as discussed in Section II of the Argument.[113]

- The summary judgment order that dismissed Plaintiff's failure-to-warn claim.[114]

- The revised summary judgment order holding that Plaintiff was required to prove the existence of a safer alternative design to the TVT.[115]

---

[112] *Id.* at 4986-87.
[113] App. Vol. VIII at 3170-74 (87:24-88:4, 90:11-23, 91:13-19).
[114] App. Vol. V at 2185.
[115] App. Vol. VI at 2464.

# SUMMARY OF THE ARGUMENT

The trial court erred in dismissing Mrs. Lewis's case on a Rule 50(a) motion, particularly after the court severely limited the testimony of Dr. Klinge. The court also erred in dismissing Mrs. Lewis's failure-to-warn claim on summary judgment. In addition, if this Court remands the case, it should reverse the trial court's ruling that required Plaintiff to prove a safer alternative design to the TVT.

First, the trial court erred in holding that Mrs. Lewis failed to create a question of fact on the issue of specific causation, even though Dr. Zimmern testified that the TVT caused her injuries. The trial court discounted that testimony because Dr. Zimmern could not describe the precise mechanism by which the TVT caused her injuries. However, this case arose under Texas common law, which does not impose such a strict evidentiary requirement.

And, even if Mrs. Lewis did have to connect her injuries to a specific defect, she presented evidence from which a reasonable jury could conclude that the TVT injured her because it contains heavyweight mesh with small pores, and/or because it is mechanically cut. Dr. Klosterhalfen testified at length about the problems with heavyweight, large-pore meshes, including scarring, shrinkage, and nerve entrapment. Dr. Jordi examined the mesh explanted from Mrs. Lewis and concluded that it had degraded, based on his observation of surface cracking and his testing that showed polypropylene flaking off of the mesh. Dr. Klinge

18

examined images of Mrs. Lewis's mesh and found evidence of scarring and nerve entrapment. This testimony ties a defect in the TVT (its nature as a heavyweight, small-pore mesh) directly to Dr. Zimmern's opinion that the TVT caused Mrs. Lewis's injuries.

Further, Plaintiff presented testimony from Dr. Rosenzweig and Ethicon employees describing the dangers of mechanically cutting the mesh, rather than cutting it with a laser. The frayed edges of mechanically cut mesh cause particle loss, which causes pain. The TVT is cut mechanically. On the images of Mrs. Lewis's explant, Dr. Klinge found a loose particle, which he described as a common result of machine-cutting the mesh. Again, this testimony creates a direct link between a specific defect and the treating physician's opinion that the TVT caused Mrs. Lewis's injuries.

The trial court appeared to insist that Plaintiff produce ultimate issue testimony from a single expert, opining that a specific defect caused Mrs. Lewis's injuries. But this ruling ignores law allowing for proof by circumstantial evidence, and for reasonable inferences by the jury. A Fifth Circuit case, applying Texas law, has stated that even cases that require expert testimony may be proven without expert testimony on the ultimate issue, as long as the expert provides sufficient information to the jury on the scientific and technical aspects of the case. *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1044-45 (5th Cir. 2011). The same logic

applies here. Mrs. Lewis gave the jury all of the scientific information that they needed to conclude that the TVT's heavyweight, small-pore mesh caused her injuries, and/or that frayed edges from its machine cutting caused her injuries.

Second, the trial court erred by excluding certain testimony from Dr. Klinge that would have provided the testimony that the court said was needed. Most notably, the court *sua sponte* excluded Dr. Klinge's answer, without a full explanation, when he was asked whether his observations about Mrs. Lewis's mesh could explain her pain. Dr. Klinge, who is not a native English speaker,[116] testified: "The opinion is that these findings can very good explain the manifestation of pain." If this Court deems it necessary, this Court should reverse the striking of that answer, which provides direct testimony on the ultimate issue.

Third, this Court should reverse the trial court's grant of summary judgment on Mrs. Lewis's failure-to-warn claim. The trial court held that Plaintiff could not prove that inadequate warnings were a "producing cause" of her injuries because Dr. Boreham testified that she did not rely on the TVT's IFU when recommending the TVT. However, she agreed that she has a duty to pass on the manufacturer's warnings to the patient. And, Mrs. Lewis testified that she would not have agreed to the TVT surgery if she had been warned about long-term pain, painful sex, and the possibility of further surgeries. There is, therefore, a genuine dispute as to

---

[116] App. Vol. VIII at 3128 (45:6-7).

whether stronger warnings would have been passed on to Mrs. Lewis, who then would have declined the TVT surgery.

Finally, if the Court remands the case on any of these grounds, it should decide the issue of safer alternative design, as an issue likely to recur on remand. Under Texas law, most design defect plaintiffs must prove the existence of a safer alternative design. Tex. Civ. Prac. & Rem. Code § 82.005(a). However, the statute specifically exempts plaintiffs in drug and medical device cases. *Id.* at § 82.005(d)(2). As such, the trial court erred in requiring Mrs. Lewis to prove a safer alternative design, and this Court should remand with instructions that such proof is not necessary when the case is re-tried.

## ARGUMENT

**I.**    **The trial court erred in granting a directed verdict on specific causation because Mrs. Lewis presented sufficient evidence that the TVT caused her injuries, regardless of whether she had to connect her injuries to a specific defect in the TVT.**

Mrs. Lewis raised a genuine factual dispute as to whether Ethicon's defective TVT device caused her injuries.  Mrs. Lewis's treating physician testified that the TVT caused her injuries.  Several scientific and medical experts testified to defects in the TVT and the clinical significance of those defects.  Two of those experts studied the particular mesh that was explanted from Mrs. Lewis' body and found evidence of degradation, nerve entrapment and loose particles—conditions that cause pain in patients.  In the face of such evidence, the trial court erred by concluding that no reasonable jury could find in Mrs. Lewis's favor.

### A. Standard of review

This Court reviews a grant of directed verdict under Rule 50(a) *de novo*. *Sales v. Grant*, 158 F.3d 768, 775 (4th Cir. 1998).  The Court's objective is **"**to determine whether the evidence … would have permitted a jury reasonably to return a verdict in [Plaintiff's] favor." *Id.*  The Court "must view the evidence in the light most favorable to [Plaintiff], the nonmovant, and draw all reasonable inferences in [her] favor without weighing the evidence or assessing the witnesses' credibility." *Baynard v. Malone*, 268 F.3d 228, 234-35 (4th Cir. 2001).  This Court must reverse the trial court's judgment if "reasonable minds could differ as to the

22

conclusion to be drawn from the evidence." *Sales*, 158 F.3d at 775. When this Court reverses a directed verdict, the remedy is a new trial. *Id.* at 770.

The causation standard, under Texas law,[117] is "producing cause." A producing cause is a cause that is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007); *see also Royal Globe Ins. Co. v. Suson*, 626 S.W.2d 161, 162-63 (Tex. App. 1981). Mrs. Lewis testified that she suffered from dyspareunia and from gradually worsening pelvic pain, following the TVT surgery.[118] Thus, the causation issue is whether Ethicon's defective TVT device was a substantial factor in causing her pain.

## B. The treating physician's testimony that the TVT caused Mrs. Lewis's injuries was sufficient to create a question of fact for the jury.

### 1. Texas law does not require Plaintiff to connect her injuries to specific defects in the TVT.

A 1993 Texas statute requires a design defect plaintiff to show that "the defect" in the unreasonably dangerous product "was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery." Tex. Civ. Prac. & Rem. Code § 82.005(a)(2). Thus, Texas cases are often framed in terms of whether the alleged defect caused the injury. *See, e.g.*, *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). However, the statute also states

---

[117] Texas law applied to the substantive liability aspects of the case.
[118] App. Vol. VIII at 3349-51 (42:3-44:10).

that "[t]his section does not apply to: a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act."  Tex. Civ. Prac. & Rem. Code § 82.005(d)(2) (emphasis added).  Thus, neither the statute nor cases applying the statute define the causation inquiry in a medical device case.

Texas's common law on strict liability is derived from Restatement (Second) Torts § 402A.  *See, e.g.*, *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996).  Section 402A describes the product liability inquiry as follows:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property.

Rest. 2d Torts § 402A.  The policy behind Section 402A is that a company that sells an unreasonably dangerous product, which then injures a user, should held liable.  *See id.*, cmt. c.  Following that logic, Mrs. Lewis simply must show that the TVT device is defective, and that it injured her.

Texas courts have been inconsistent when discussing whether plaintiffs must link their injuries with the product or with a defect in the product, but there is ample support for the former view.  *See, e.g.*, *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 700 (Tex. App.–Houston 2010) (concluding that there were genuine fact issues "as to whether the allegedly defective product was a producing cause of the alleged damages"); *see also Bigelow v. New York Lighter Co.*, 2005

24

US Dist. LEXIS 47871, at *36 (W.D. Tex. June 27, 2005) (stating that "[u]nder Texas law, a products liability plaintiff need only show that the defendant's allegedly defective product was, more likely than not, a substantial factor in bringing about the harm sustained"); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724 (Tex. App.–Dallas 1992) (finding sufficient evidence that [the defendant's] fiberboard proximately caused [the plaintiff's] damages").

Rather than focusing on how the test is framed, this Court should focus on how the Texas Supreme Court decided this issue when the distinction mattered. In *Grinnell*,[119] the decedent died of lung cancer after smoking the defendant's cigarettes. *Grinnell*, 951 S.W.2d at 425. The plaintiffs claimed that the cigarettes (the product) were defective because of pesticide residue (the defect) used in the manufacturing process. *Id.* at 433-34. No expert testified that the pesticide residue, specifically, caused the decedent's lung cancer. *Id.* at 434. Still, the court denied summary judgment on a manufacturing defect claim. The court wrote that the experts' causation opinions "were based on generic smoking studies that did not isolate individual brands of cigarettes and their individual effects." *Id.* Therefore, "[t]he Grinnells' experts' testimony merely illustrates that the experts'

---

[119] *Grinnell* was a common-law case, even though it was decided after the implementation of Tex. Civ. Prac. & Rem. Code § 82.005. The cause of action arose before the statute became law. *See id.* at 433 n.9.

conclusions that smoking caused Grinnell's cancer were not dependent on the presence of pesticide residue, not that pesticide residue could not have contributed to or caused Grinnell's cancer." *Id.* at 435.

With that holding, the Supreme Court refused to require a link between the alleged defect (pesticide residue) and the plaintiff's injury (cancer). Rather, the court simply required a showing that the product (the cigarette) was defective, and that the product had injured the decedent. *See id.* at 434-35. In this case, the trial court rejected that approach, stating that "the plaintiff needed to present evidence that a <u>particular</u> -- a proven design defect caused Miss Lewis's injuries."[120] The court concluded that Plaintiff failed to offer expert testimony "that a design defect in the TVT caused Miss Lewis's harm."[121]

The trial court erred by requiring a standard of proof that the Texas Supreme Court rejected in *Grinnell*. The issue on specific causation should have been, did Mrs. Lewis produce sufficient evidence that <u>the TVT</u> caused her injuries?

     2.  <u>Dr. Zimmern testified that the TVT caused Mrs. Lewis's pain,<br>which is sufficient to establish specific causation under Texas law.</u>

Philippe Zimmern is a urologist who has ample experience with explanting failed mesh products from the pelvic floor.[122] He partially explanted the TVT from

---

[120] App. Vol. IX at 3856 (59:14-16) (emphasis added).

[121] *Id.* at 3857 (60:16-18).

[122] *Id.* at 3734 (67:6-7), 3738 (84:12-85:14).

Mrs. Lewis.[123]  He testified to a reasonable degree of medical probability[124] that the

TVT caused Mrs. Lewis's pain:

> Q.    In your care and treatment of Ms. Lewis, did you diagnose a cause of the pain and the dyspareunia Ms. Lewis was experiencing before the operation?
>
> A.    Yeah.  I mean, she definitely had pain on examination where the tape was, so the answer is yes.
>
> Q.    And so I understand your testimony, did you diagnose, as part of your care and treatment of Carolyn Lewis, what the cause of the pain and dyspareunia was?
>
> A.    The cause being the presence of the tape [the TVT].  By which mechanism in the tissue she hurts, that, I don't know.[125]

The trial court discounted Dr. Zimmern's testimony because he could not

identify the specific mechanism through which the TVT caused Mrs. Lewis's

pain.[126]  But the trial court erred in requiring that Mrs. Lewis connect a specific

defect to her injuries.  Dr. Zimmern's testimony connects the TVT directly to Mrs.

Lewis's pain, which is all that the Texas Supreme Court required in *Grinnell*.  This

Court, therefore, should reverse the trial court's judgment.

---

[123] *Id.* at 3747 (113:21-114:1), 3749 (120:1-8).
[124] *Id.* at 3735-36 (71:18-21).
[125] *Id.* at 3741 (95:4-18).
[126] *Id.* at 3857-58 (60:23-61:8).

27

**C. Mrs. Lewis produced sufficient evidence from which a jury could conclude that specific defects in the TVT caused her pain.**

Though the trial court erred in requiring such proof, Mrs. Lewis also offered sufficient evidence that her injuries were attributable to specific defects in the TVT: (1) the TVT's heavyweight, small-pore mesh and/or (2) the mechanically cut edges of the TVT mesh. The trial court apparently discounted Plaintiff's evidence because it was not neatly packaged in the testimony of a single expert. Texas law, however, allows causation to be inferred from circumstantial evidence. *Goodner*, 650 F.3d at 1044; *Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987).

Allowing for reasonable inferences by the jury, this Court should conclude that Mrs. Lewis provided sufficient evidence on specific causation—even assuming, *arguendo*, that she had to connect her injuries to specific defects in the TVT.

       1.  The trial court erred in requiring expert testimony that directly addressed the ultimate issue, rather than allowing for reasonable inferences by the jury.

Even if the trial court was correct in requiring Mrs. Lewis to connect her injuries to a specific defect (or defects) in the TVT, the court erred by refusing to let the jury make any inferences as to causation. Instead, the trial court appeared to conclude that causation could only established through a single expert's direct

28

testimony.[127]  This approach is contrary to Texas law.  *See Goodner*, 650 F.3d at

1044 (stating that a court should grant judgment as a matter of law as to causation

only "if all the facts and inferences point so strongly against causation that no

reasonable jury could find causation").

     While expert testimony is necessary to establish causation in this case,

expert testimony is not required on the ultimate issue.  Essentially, the trial court

required Mrs. Lewis to produce a single witness with the scientific and medical

expertise to explain the flaws in the TVT and how they injured Mrs. Lewis.  In

reality, the jury should be permitted to draw reasonable inferences, as long as the

plaintiff provides sufficient expert testimony on the scientific aspects of the case.

*See Goodner*, 650 F.3d at 1044 (noting that "causation need not be supported by

direct evidence").

     The Fifth Circuit discussed this issue at length in *Goodner*, applying Texas

law.  In *Goodner*, the family of a young woman (Sarah) who had been killed in an

auto accident asserted that the passenger seat was defective because it reclined past

45 degrees, allowing her to be thrown from the car while wearing her seatbelt.  *Id.*

at 1039.  The trial court "prohibited [the expert] from testifying as to the ultimate

issue—that the seat recline caused Sarah's injuries."  *Id.*  Still, the Fifth Circuit

---

[127] The court went through each expert's testimony and concluded that none had
testified that a defect in the TVT had caused Mrs. Lewis's injuries.  App. Vol. IX
at 3858-59 (61:9-62:1).

held that there were "not enough inferences pointing against causation" to support granting judgment as a matter of law.  *Id.*

The *Goodner* court recognized that the case required expert testimony.  The plaintiffs' expert testified that the seat recline caused Sarah's ejection, and that ejection greatly increases the risk of injury.  *Id.* at 1045.  The court described these opinions as touching on the "most technical" aspects of the case.  *Id.*  "Once sufficient evidence of these two elements was established … it was not unreasonable for the jury, without an expert's testimony, to infer causation."  *Id.*

A California federal district court reached a similar conclusion, applying Texas law and citing *Goodner.  See Holt v. Globalinx Pet, LLC*, No. SACV13–0041 DOC, 2013 WL 3947169, at *15 (C.D. Cal. July 30, 2013) (denying motion to dismiss based on veterinarian's statement in pleading that dog treats were contaminated, together with facts of dog's illness and death, although complaint failed to allege that contaminated treats caused the dog's death).

In this case, Mrs. Lewis did not need an expert to opine that a specific defect—or defects—in the TVT caused her injuries.  Rather, she needed to adduce sufficient expert testimony on the scientific and medical aspects of the case, from

which a reasonable jury could infer that the defects in the TVT caused her

injuries.[128]  She met this standard, and the trial court erred in dismissing her case.

> 2.  A reasonable jury could have concluded that particular defects in the TVT caused Mrs. Lewis's injuries.

Even in cases arising under Tex. Civ. Prac. & Rem. Code § 82.005, where

plaintiffs must connect their injuries to a product defect, plaintiffs are not required

to isolate a single defect.  *See, e.g.*, *General Motors Corp. v. Sanchez*, 997 S.W.2d

584, 589 (Tex. 1999) (expert gave four theories as to how gear shift could have

migrated to reverse, causing accident); *Kia Motors Corp. v. Ruiz*, 348 S.W.3d 465,

478 (Tex. App.–Dallas 2011) (expert testified that one or both of two components

of a circuit malfunctioned, preventing air bag from deploying).  Here, Plaintiff

discussed several defects in the TVT at trial, and two in particular:

- The TVT is a heavyweight, small-pore mesh, which caused degradation, scarring and nerve entrapment, thereby causing her pain.

- The TVT is mechanically cut, which caused her mesh to lose particles, thereby causing her pain.

---

[128] This statement assumes, *arguendo*, the need to connect her injuries to a specific defect.

> *a) Plaintiff's evidence showed that the TVT's heavyweight, small-pore mesh caused degradation, scar tissue, and nerve entrapment, which caused her pain.*

One important flaw with the TVT's design is that it is a heavyweight, small-pore mesh.[129]  Large-pore meshes have better biocompatibility than the TVT, and less fibrotic reaction.[130]  Because large-pore meshes have less polypropylene content, they produce less of an inflammatory response, and less shrinkage.[131]  In comparing the TVT's Prolene mesh to the light-weight, large-pore mesh used in Vypro, Dr. Klosterhalfen observed that the small-pore mesh caused much more scar tissue.[132]  That scar tissue causes the mesh to shrink, as the body tries to remove it.[133]  The shrinking scar tissue can entrap nerves, causing chronic pain.[134]  Due to the lesser fibrotic reaction seen with lightweight, large-pore meshes, there is less stiffening, less shrinkage, and "these patients have a better comfort," with less chronic pain.[135]

Dr. Rosenzweig testified that when he began using the TVT, he "found that there was a lot of scarring that was taking place and … that the mesh was heaped

---

[129] App. Vol. VI at 2658 (51:23-25).
[130] *Id.* at 2660 (71:5-24).
[131] *Id.* at 2650-51 (28:21-31:19).
[132] *Id.* at 2663 (82:20-83:8).
[133] *Id.* (83:24-84:14).
[134] *Id.* at 2665 (88:16-89:15).
[135] *Id.* at 2654 (41:22-42:20).

up."[136]  Further, when he would explant the TVT from patients suffering from

complications, he would see that the TVT "looked smaller, narrower, shrunken if

you will … ."[137]  This shrinkage causes pain for the patient.[138]  The shrinkage

causes tension, and it draws nerves into the mesh, "just like you're vacuuming and

you inadvertently vacuum over the cord.  That cord gets drawn into the suction of

the vacuum."[139]

The testimony of current and former Ethicon employees further explained

how the TVT's heavyweight, small-pore mesh creates clinical difficulties.  Piet

Hinoul, an Ethicon medical director, acknowledged that the mesh could contract,

that the mesh could damage nerves, and that the mesh could cause the formation of

scar tissue, all of which cause pain for patients.[140]  He does not believe that any

company would bring a heavyweight, small-pore mesh onto the market today.[141]

Joerg Holste, who worked with Dr. Klinge and others on surgical mesh

projects for Ethicon,[142] testified that heavyweight meshes cause a greater foreign

body reaction than lightweight meshes, and that a greater inflammatory reaction

---

[136] App. Vol. VII at 2766-77 (70:11-:71:1).

[137] *Id.* at 2767 (71:6-7).

[138] *Id.* at 2774 (78:22-24).

[139] *Id.* at 1774-75 (78:25-79:6).

[140] App. Vol. VII at 2867-69 (577:23-578:4, 778:9-779:2, 777:4-12).

[141] *Id.* at 2874 (1049:24-1050:12).  Dr. Hinoul stated that he would not classify the TVT as a heavyweight, small-pore mesh, but he acknowledged that others have classified it in that manner.  *Id.* at 2873-74 (1047:24-1048:5, 1111:25-1112:18).

[142] App. Vol. VIII at 3281 (28:7-12).

can cause pain for patients.[143]  He acknowledged that the body's scar tissue and inflammatory response causes the mesh to shrink and bunch.[144]  Dr. Arnaud agreed that larger pores reduce the inflammatory reaction in the body, and that this inflammatory reaction can cause the TVT mesh to shrink.[145]

Mrs. Lewis presented two expert witnesses who studied the <u>specific</u> TVT mesh explanted from her.  Dr. Jordi testified that he observed "large-scale cracks" in the explant, which he determined, through testing, was due to the loss of polypropylene from the mesh.[146]  Dr. Jordi concluded that Mrs. Lewis's mesh had degraded inside her body, and that the mesh remaining following her partial explant would continue to degrade.[147]

Dr. Klinge examined various images from Mrs. Lewis's explant.  He testified that "[y]ou see in this image that the entire space between these filaments is filled by scar tissue.  There is no other -- there is no other tissue. … So the pores here in this cross-cutting are very, very small, and all this tissue around these mesh materials, it's only scar tissue."[148]  When asked about the clinical significance of

---

[143] *Id.* at 3297 (55:22-56:5, 56:15-21).

[144] *Id.* at 3286 (154:6-11).

[145] App. Vol. IX at 3626-27 (759:8-18, 763:13-23).

[146] App. Vol. VII at 2935-36 (56:25-57:9).

[147] *Id.* at 2938 (59:15-25).

[148] App. Vol. VIII at 3160 (77:11-20).

what he had observed, Dr. Klinge testified that "the huge amount of scar tissue is a serious -- or reason for chronic pain."[149]

Dr. Klinge further explained that shrinkage had caused a folding of Mrs. Lewis's mesh and "deformation of the mesh structure."[150] This shrinkage and folding, in turn, creates "an increased risk for pain and you have an increased risk for erosion of adjacent organs."[151] While showing another image from Mrs. Lewis's explant, Dr. Klinge described that it showed "tissue that appears to be a small nerve."[152] Dr. Klinge stated that the nerve was trapped within the area of scar tissue, and "when you have the contraction of the scar tissue, then this can result in irritation of these nerve structures and cause chronic pain."[153]

Dr. Zimmern, who explanted Mrs. Lewis's mesh, opined that the TVT device caused Mrs. Lewis's pain.[154] He said it was not a difficult diagnosis.[155] Further, Mrs. Lewis testified that her pain substantially decreased after the explant surgery.[156]

So, the jury was given all of the following information related to the TVT's property as a heavyweight, small-pore mesh, supported by testimony from several

---

[149] *Id.* at 3163 (80:1-9).
[150] *Id.* at 3166 (83:2-13).
[151] *Id.* (83:18-24).
[152] *Id.* at 3169 (86:4-8).
[153] *Id.* (86:13-18).
[154] App. Vol. IX at 3780 (95:4-18).
[155] *Id.* at 3780-81 (96:10-14).
[156] App. Vol. VIII at 3368 (61:6-62:7).

expert witnesses, from several current and former Ethicon employees, and from Mrs. Lewis's treating physician:

- The TVT is a heavyweight, small-pore mesh.

- Compared with lightweight, large-pore meshes, heavyweight, small-pore meshes cause greater fibrotic reaction, inflammatory response, and scarring, which leads to nerve entrapment. There is also more shrinkage and deformity of the mesh. These complications cause pain for patients.

- Mrs. Lewis's explanted mesh was cracked and degraded.

- Mrs. Lewis's explanted mesh showed significant scarring, an entrapped nerve, and shrinkage that caused a folding of the mesh.

- Mrs. Lewis experienced pelvic pain and dyspareunia after having the TVT implanted.

- Mrs. Lewis's explanting physician, Dr. Zimmern, testified that the TVT was the cause of her pain.

From this evidence, a reasonable jury could conclude that scar tissue, mesh shrinkage, and entrapped nerves caused Mrs. Lewis's pain. That conclusion ties Mrs. Lewis's injuries (her pain) directly to a defect in the mesh (its heavy weight and small pores). As in *Goodner*, this evidence provides the jury with the technical knowledge necessary to make a reasonable inference as to the ultimate issue. Thus, the trial court erred in granting judgment as a matter of law.

36

> b) *Plaintiff offered evidence that the mechanically cut mesh of the TVT caused loose particles, which caused her pain.*

The TVT is mechanically cut, rather than being cut by a laser like some brands of surgical mesh, including Ethicon's TVT-Secur.[157]  Mechanically cut mesh is more likely to fray, rope, curl, and deform, causing particle loss.  This particle loss, which was observed in Mrs. Lewis's explant, causes dyspareunia, which was one of Mrs. Lewis's primary symptoms.

Dr. Rosenzweig testified that laser-cutting the mesh would prevent problems caused by mechanically cutting the mesh, such as roping, curling, flaking and particle loss.[158]  Evidence from Ethicon documents and testimony supports that conclusion.  In 2004, a series of Ethicon e-mails discussed the fraying mesh, stating that "the root cause of this phenomenon are [sic] known: the way to cut the mesh (blade cutting)."[159]  The author wrote that Ethicon could "limit the mesh fraying defect significantly" by cutting the mesh ultrasonically or with a laser.[160]  In 2005, Ethicon product director Allison London Brown told other Ethicon employees that the mechanically cut mesh "is perceived by some physicians as inferior and we do get a high number of complaints on linting and roping."[161]

---

[157] *Id.* at 3257 (202:23-203:15).
[158] App. Vol. VII at 2781 (85:18-25).
[159] App. Vol. VIII at 3413 (13:3-8).
[160] *Id.* (13:9-14).
[161] *Id.* (19:12-19); *see also* App. Vol. X at 4444.

37

In 2006, Ethicon engineer Gene Kammerer created a memo describing the benefits of using laser-cut mesh instead of mechanically cut mesh. Mr. Kammerer wrote that improvements include reducing fraying and particle loss.[162] He also wrote that laser-cutting the mesh would significantly reducing particle loss,[163] and that laser-cutting the mesh would reduce the sharp edges created by mechanical cutting.[164] Mr. Kammerer created a presentation with photographs showing the difference between laser-cut mesh and mechanically-cut mesh:[165]



---

[162] App. Vol. VIII at 3258 (214:5-15); *see also* App. Vol. X at 4412.

[163] App. Vol. VIII at 3259-60 (222:12-223:5).

[164] *Id.* (223:6-9).

[165] App. Vol. X at 4296 (image size altered). The samples were pulled to 50% elongation. *Id.* at 4293.

Particle loss is significant because it causes pain, including dyspareunia. Dr. Rosenzweig described a document discussing Ethicon interviews with physicians, including a well-known English urogynecologist named Dr. Hilton, who was an Ethicon consultant. When asked about particles falling off of the TVT mesh, Dr. Hilton stated that "small particles can migrate and cause pain during intercourse."[166] Based on his literature review and his clinical experience, Dr. Rosenzweig opined that particles from the TVT mesh "can fall off into the vagina and cause pain. I've seen that in patients myself."[167]

Dr. Rosenzweig's conclusion is backed by a study conducted by Ethicon's Dr. Brigitte Hellhammer, who interviewed physicians. One physician stated that "it is of utmost importance that the mesh is cuttable and that it does not fray or release particles after cutting. The small particles migrate and cause pain during intercourse."[168]

In examining Mrs. Lewis's explant, Dr. Klinge observed a loose particle. He testified as follows:

> A. What you see on this image, as well, is here you have this blue marked foreign body. This is a particle. You see this blue is the polymer which has not been removed by the cutting procession, and you see that there is already a tissue reaction around. And [this] is a

---

[166] App. Vol. VII at 2795-96 (99:16-100:7).
[167] *Id.* at 2796 (100:8-19).
[168] App. Vol. VIII at 3254-55 (184:13-185:6, 190:8-18); App. Vol. X at 4403.

typical example of these particles which result from the cutting of the mesh during the manufacturing.[169]

Thus, Plaintiff presented the trial court with evidence that:

- The TVT mesh is mechanically cut.

- Mechanically cut mesh often ropes, frays, and curls, and these problems could be cured by laser-cutting the mesh.

- Roping and fraying of the mesh causes particle loss.

- Particle loss causes pain and dyspareunia.

- In analyzing the mesh explanted from Mrs. Lewis, Dr. Klinge identified a loose particle with a tissue reaction around it.  He opined that this particle was typical of the particle loss caused by mechanically cutting the mesh.

- Mrs. Lewis has suffered from pelvic pain and painful sex.

- Mrs. Lewis's explanting physician, Dr. Zimmern, testified that the TVT caused Mrs. Lewis's pain.

Plaintiff provided ample evidence from which a reasonable jury could conclude that particle loss from Mrs. Lewis's mechanically cut mesh caused her pain.  That conclusion ties Mrs. Lewis's injuries (her pain) directly to a defect in the mesh (its mechanically cut edges).  As in *Goodner*, this evidence provides the jury with the scientific knowledge necessary to make a reasonable inference as to

---

[169] App. Vol. VIII at 3167 (84:7-13).

the ultimate issue. Thus, the trial court erred in granting judgment as a matter of law.

## II.    The trial court committed reversible error by preventing Dr. Klinge from directly connecting his observations about the condition of Mrs. Lewis's mesh with her pain.

This Court should also reverse the trial court's grant of a directed verdict because the trial court improperly prevented the testimony that the court held to be lacking. Thus, even if this Court concludes that Mrs. Lewis had to provide expert testimony directly addressing the ultimate issue, this Court should reverse the trial court's judgment because the district court erred in preventing Dr. Klinge from giving that testimony.

### A. Standard of review

This Court generally reviews a trial court's decision to admit or exclude evidence for abuse of discretion. *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011). A district court abuses its discretion when it acts arbitrarily, *see id.*, or applies "erroneous legal principles to the case." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995). The Third Circuit has recognized an exception to this general rule, employing *de novo* review where the trial court fails to explain adequately the basis for its decision to exclude evidence. *United States v. Sriyuth*, 98 F.3d 739, 745 n.9 (3d Cir. 1996) (explaining that the Court of Appeals would

41

weigh the evidence under Rule 403 because the trial court had not made the basis

of its exclusion under Rule 403 a part of the record).

> **B. The trial court erroneously prevented Dr. Klinge from opining that the condition of the mesh was the cause of Mrs. Lewis's pain.**

The trial court severely limited the questioning of Dr. Klinge. These

exclusions occurred when Dr. Klinge was asked to give opinions linking Dr.

Klinge's observations about Mrs. Lewis's mesh to the pain that she was

experiencing. The portions of the transcript at issue are as follows:

> Q. Do you have an opinion as to whether or not these entrapped nerves in this slide indicate -- would indicate chronic pain for Ms. Lewis?
>
> MR. THOMAS: Objection, your Honor. Foundation.
>
> THE COURT: Sustained. Sustained.
>
> \*\*\*
>
> Q. Do you have an opinion to a reasonable degree of medical certainty as to whether or not the images that we've seen on the screen today would relate to any complications of pain in Ms. Lewis?
>
> MR. THOMAS: Objection, your Honor. Foundation. It's not his area of expertise.
>
> THE COURT: With the caution, ladies and gentlemen, that I previously gave you, I will allow the answer.
>
> BY MR. ANDERSON:
> Q. Do you have an opinion, first of all, sir?
>
> A. Yes.

42

Q. And what is that opinion?

A. The opinion is that the excessive scar formation that we have found to be the major cause of many complications, that this is found in these samples in this case, as well. We saw the scar formation, the deformation, the folding, the particle loss. So, all these things that we found were the disadvantages of over-engineered meshes. In animals' –

MR. THOMAS: Your Honor, going far beyond the question that was asked.

THE COURT: Well, and also –

MR. THOMAS: I move to strike it.

THE COURT: I sustain the objection.

***

Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether or not the slides that we've just seen, the S-100 slides, and the H&E slides regarding nerve entrapment, mesh shrinkage and bridging fibrosis, as to whether or not those would lead to chronic pain in Ms. Lewis?

MR. THOMAS: Objection, your Honor.

THE COURT: I overrule the objection.

BY MR. ANDERSON:
Q. Do you have an opinion?

A. Yes.

Q. And what is the opinion?

A. The opinion is that these findings can very good explain the manifestation of pain.

43

THE COURT: I'll sustain the objection and strike the answer. The jury will disregard.

MR. ANDERSON: No further questions.

THE COURT: Can explain -- can explain is not the –

BY MR. ANDERSON:
Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether or not –

THE COURT: I've got your objection.

MR. ANDERSON: No further questions.[170]

There are several problems with the trial court's exclusion of Dr. Klinge's testimony. First, the trial court abused its discretion in sustaining the "foundation" objection to the question: "Do you have an opinion as to whether or not these entrapped nerves in this slide indicate -- would indicate chronic pain for Ms. Lewis?"[171] "[N]o rule of evidence requires a 'foundation.'" *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). Rather, "foundation is simply a loose term for preliminary questions designed to establish that evidence is admissible." *Id.* Thus, the objection was not sufficiently specific and should not have been sustained—particularly with no further explanation.[172]

---

[170] App. Vol. VIII at 3170-75 (87:24-88:4, 89:24-90:23, 91:4-92:2).

[171] *Id.* at 3170-71 (87:24-88:4).

[172] *See id.* Based on the ensuing objection, Ethicon may have been alleging a lack of qualifications. But the objection based on qualifications, which followed a similar question, was overruled. *Id.* at 3171-72 (89:24-90:7). Therefore Plaintiff,

Second, the trial court erred in striking Dr. Klinge's discussion of whether the condition of Mrs. Lewis's explant "would relate to any complications of pain in Mrs. Lewis."[173]  Defense counsel cut off Dr. Klinge's answer and moved to strike it, asserting that the answer exceeded the scope of the question.  The court "sustain[ed] the objection."[174]  However, the majority of Dr. Klinge's answer responded directly to the question.  He testified:

> The opinion is that the excessive scar formation that we have found to be the major cause of many complications, that this is found in these samples in this case, as well. We saw the scar formation, the deformation, the folding, the particle loss.[175]

Finally, the Court erred in *sua sponte* striking Dr. Klinge's answer when asked whether the conditions he identified on Mrs. Lewis's explant "would lead to chronic pain in Ms. Lewis?"[176]  The court overruled an objection to the question, and then counsel asked two more questions without objection.  Dr. Klinge—whose first language is not English—stated his opinion "that these findings can very good explain the manifestation of pain."[177]  Without defense counsel objecting, the court

---

and this Court, can only guess as to the trial court's grounds for sustaining the "foundation" objection.
[173] *Id.* at 3172-73 (89:24-90:7).
[174] *Id.* at 3173 (90:23).  It appears, but is not fully clear, that the court intended to grant the motion to strike when stating "I sustain the objection."
[175] *Id.* (90:12-16).
[176] *Id.* at 3174 (91:4-19).
[177] *Id.* (91:16-17).

45

stated: "I'll sustain the objection and strike the answer.  The jury will disregard."[178]
The court appeared to take issue with Dr. Klinge's precise wording, stating: "Can explain – can explain is not the …"[179]  But counsel tried to ask another question, and the court lodged another objection for the defense.[180]  Plaintiff's counsel then stopped the questioning, believing it to be futile.[181]

The trial court erred in striking Dr. Klinge's answer for several reasons. First, it did so without any objection or motion to strike associated with that particular question and answer.  In doing so, the court wrongfully shifted the burden from the Defendant—which must provide grounds to exclude the Plaintiff's evidence—to the Plaintiff, who then had to overcome the court's *sua sponte* objection.  *Cf. Kennedy v. Joy Techs., Inc.*, 269 Fed. App'x 302, 310-11, (4th Cir. March 12, 2008) (reversing *sua sponte* exclusion of agency's report where defendant failed to object, noting that it was the defendant's burden to show that the report was not trustworthy).

Second, the Court did not adequately explain the basis for the exclusion.[182] Counsel did ask another question, but the court could have stopped counsel to continue its explanation.  As noted, this Court should review the exclusion *de novo*

---

[178] *Id.* (91:18-19).

[179] *Id.* (91:21-22).

[180] *Id.* at 3174-75 (91:24-92:1).

[181] *Id.* at 3175 (92:2).

[182] *Id.* at 3174 (91:21-22).

46

because of the district court's failure to explain fully its basis for striking the testimony. *See Sriyuth*, 98 F.3d at 745 n.9.

Finally, there was no evidentiary basis to strike Dr. Klinge's testimony. It appears that the court took issue with the word "can," as opposed to Dr. Klinge saying that the condition of Mrs. Lewis's explant "does" or "must" explain her pain. But if that was, indeed, the trial court's ruling, the court should not have cut off the follow-up question, which may have clarified the response.[183]

The court may have considered the answer to be non-responsive. But if it did, the court should have given Dr. Klinge the opportunity to correct the non-responsive testimony. *See Magyar v. United Fire Ins. Co.*, 811 F.2d 1330, 1331 (9th Cir. 1987); *United States v. Panza*, 612 F.2d 432, 439 (9th Cir. 1979).

For all of these reasons, this Court should consider all of the testimony given by Dr. Klinge when evaluating the strength of Plaintiff's evidence—including the testimony that was erroneously stricken by the trial court.

### C. Dr. Klinge's stricken testimony provides an expert opinion on the ultimate issue, if this Court determines that such a statement is necessary.

While Dr. Klinge's English is imperfect, he attempted to explain that the conditions he had described in Mrs. Lewis's mesh were the cause of her pain.

---

[183] *Id.* at 3174-75 (91:24-92:1).

47

Therefore, he was trying to provide the ultimate issue testimony that the trial court held was lacking.

First, Dr. Klinge should have been allowed to answer the question: "Q. Do you have an opinion as to whether or not these entrapped nerves in this slide indicate -- would indicate chronic pain for Ms. Lewis?"[184]  Had he answered yes, that answer would have directly linked a defect in the product with Mrs. Lewis's pain.  As explained above, Dr. Klosterhalfen testified that small-pore mesh causes much more scar tissue,[185] that scar tissue causes shrinkage of the mesh,[186] and that scar tissue can then entrap nerves, causing chronic pain.[187]  Dr. Klinge should have had the chance to testify that the scarring and entrapped nerve that he observed in Mrs. Lewis's explant were the source of her pain.

Second, when asked if the conditions he had observed in Mrs. Lewis's explant "would relate to any complications of pain in Mrs. Lewis," he replied that "the excessive scar formation that we have found to be the major cause of many complications, that this is found in these samples in this case, as well."[188]  Then,

---

[184] *Id.* at 3170-71 (87:24-88:4).
[185] App. Vol. VI at 2663 (82:20-83:8).
[186] *Id.* (83:24-84:14).
[187] *Id.* at 2665 (88:16-89:15).
[188] App. Vol. VIII at 3172 (89:24-90:14).

Dr. Klinge testified that his findings from examining Mrs. Lewis's mesh "can very good explain the manifestation of pain."[189]

Giving all reasonable inferences to the Plaintiff, *see Sales*, 158 F.3d at 775, one can infer that Dr. Klinge, in somewhat broken English, opined that the specific conditions that he had described in Mrs. Lewis's mesh were the source of her pain. The trial court wrote that "the plaintiff cannot simply present evidence that the TVT mesh can in general cause pain or dyspareunia and ask that the jury infer that a design defect in the TVT caused Miss Lewis's specific injuries."[190] Dr. Klinge's excluded testimony goes well beyond mere general causation testimony by specifically linking what he observed in Mrs. Lewis's mesh to her pain. Thus, the trial court's error in excluding portions of Dr. Klinge's testimony was not harmless, and this Court should remand for a new trial.

**III. The trial court erred in granting summary judgment on Mrs. Lewis's failure-to-warn claim because there was a genuine dispute of fact as to whether stronger warnings would have been passed on to Mrs. Lewis, causing her not to consent to the TVT surgery.**

The trial court further erred in granting Ethicon's motion for partial summary judgment, which prevented Mrs. Lewis from pursuing her failure-to-warn claim at trial. This Court should consider that argument, regardless of how the Court decides the issues raised in Sections I and II. That is, if the Court grants

---

[189] *Id.* at 3174 (91:16-17).
[190] App. Vol. IX at 3859 (62:3-6).

remand because Plaintiff had sufficient evidence on specific causation—or would have, if not for the court's erroneous exclusion of certain testimony—then this Court may still review the issue as one that is likely to recur on remand. *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 406 (4th Cir. 2012); *Levy v. Lexington County, S.C.*, 589 F.3d 708, 716 (4th Cir. 2009).

Alternatively, if this Court concludes that Plaintiff's design defect claim was properly dismissed, that conclusion does not dispose of Plaintiff's failure-to-warn claim. Mrs. Lewis's theory on her failure-to-warn claim is that she never would have had the device implanted if she had known of the risks. Thus, to prove causation she only needs to show that the device injured her. Dr. Zimmern testified directly to that fact.[191]

## A. Standard of review

This Court reviews "a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Turner v. United States*, 736 F.3d 274, 280 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). Courts

---

[191] App. Vol. IX at 3708 (95:4-18).

50

reviewing summary judgment motions must "view[] all facts and reasonable

inferences therefrom in the light most favorable to the nonmoving party," here

Mrs. Lewis.  *Id.*

### B. An inadequate warning is a producing cause of a patient's injury if it prevents the physician from passing on warnings that would have caused the patient to refuse the medical device.

To recover on a failure-to-warn claim in Texas, a plaintiff must prove that:

"(1) the warning was defective; and (2) the failure to warn was a producing cause

of the plaintiff's condition or injury."  *Porterfield v. Ethicon, Inc.*, 183 F.3d 464,

468 (5th Cir. 1999).  The trial court granted summary judgment on the second

point, ruling that Plaintiff had failed to create an issue of fact as to whether

Ethicon's inadequate warnings caused Mrs. Lewis's injuries.[192]

Texas law provides two methods for establishing causation in a failure-to-

warn case.  One source of proof would be the physician's testimony that she would

not have prescribed the drug if it had contained a stronger warning.  *McNeil v.

Wyeth*, 462 F.3d 364, 372 (5th Cir. 2006).  Inadequate warnings may also cause

injury if a stronger warning would have led the plaintiff to withhold consent.

Thus, Texas recognizes a two-step approach to establishing causation through

proof that: (1) the physician would have informed a patient of risks had they been

known, and (2) the patient would have rejected the drug or device if she had been

---

[192] App. Vol. V at 2185.

fully informed of the risks.  *Id.* at 372-73; *see also Ackermann v. Wyeth Pharms.*, 471 F. Supp. 2d 739, 747 (E.D. Tex. 2006).

Thus, an inadequate label causes a patient's injury when it interferes with <u>the patient's</u> decision-making process.

> [W]here the physician would have adequately informed a plaintiff of the risks of a disease, had the label been sufficient, but fails to do so on that account, and where the plaintiff would have rejected the drug if informed, the inadequate labeling could be a "producing" cause of the injury, because it effectively sabotages the function of the intermediary.

*McNeil*, 462 F.3d at 373; *see also Ackermann*, 471 F. Supp. 2d at 747 (same).

This Court has applied the same rule.  In *Fussman v. Novartis Pharmaceuticals Corp.*, 509 Fed. App'x 215 (4th Cir. Feb. 8, 2013), this Court affirmed a punitive damage verdict against Novartis.  The doctor testified that she would have prescribed the drugs even with a stronger warning, but the plaintiff testified that she would not have taken the drug if she had known about the risks. *Id.* at 224.  *See also Guenther v. Novartis Pharm. Corp.*, No. 6:80-cv-456-Orl-31DAB, 2013 WL 1498162, at *2 (M.D. Fla. April 9, 2013) (rejecting summary judgment motion, despite lack of evidence that warnings would have changed the physician's prescribing decision, where plaintiff testified that she would not have taken the drug had she known the risk of a particular complication).

**C. There is a fact issue on causation, based on Dr. Boreham's testimony that she has a duty to convey warnings to the patient and Mrs. Lewis's testimony that she would have refused the device if she had been properly warned.**

Dr. Boreham, the implanting physician, acknowledged her duty to disclose known risk information about the medical devices she recommends.[193] Dr. Boreham agreed that the information in the IFU is "information that the patient needs to know."[194] This information must be conveyed to the patient, so that the patient will fully understand any possible adverse reactions from using the device.[195] Similarly, Dr. Boreham testified that she uses the TVT patient brochure when counseling her patients, to explain the procedure.[196]

Mrs. Lewis testified by affidavit that Dr. Boreham did not tell her "that following the surgery, I might experience permanent dyspareunia, permanent nerve pain or damage, or other permanent pain."[197] Mrs. Lewis also was not told that she might need further surgery to remove the mesh, or that in such a case only a portion of the mesh would be removed.[198] Though Mrs. Lewis listened to Dr. Boreham, she made her own decision about whether to consent to the TVT mesh

---

[193] Id. at 2271 (102:24-103:3).
[194] *Id.* at 2270 (90:16-20).
[195] *Id.* (92:18-93:1).
[196] *Id.* at 2268 (75:8-15).
[197] *Id.* at 2021.
[198] *Id.*

53

implantation.[199]  Mrs. Lewis stated: "Had I been told by Dr. Boreham that the mesh

would cause permanent dyspareunia, permanent nerve pain or damage, or other

permanent pain I would not have decided to have the mesh implanted."[200]  Further,

Mrs. Lewis would not have consented to the TVT surgery if she had known that

she would need repeat surgeries if there were problems with the mesh, and that not

all of the mesh would be removed.[201]  None of these risks are warned of—

explicitly or implicitly—in the TVT IFU.[202]

　　　The trial court erred in granting summary judgment despite that testimony.

Granting all reasonable inferences to Mrs. Lewis, a reasonable jury could have

concluded that Dr. Boreham would have passed on any additional warnings to Mrs.

Lewis, including warnings about chronic pain, dyspareunia, and the potential need

for future surgeries.  As discussed, Dr. Boreham recognized her duty to pass on

warnings about adverse results to the patient.[203]  Had Ethicon put those warnings

into the IFU and/or patient brochures, it is reasonable to conclude that Dr.

Boreham would have passed them on, pursuant to this duty.  Mrs. Lewis testified

that she would not have had the product implanted if she had known about certain

---

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.* at 1930-36.

[203] *Id.* at 2268-71, 2274 (75:8-15, 90:13-20, 92:18-93:1, 102:24-103:3, 171:18-172:6).

adverse reactions.[204]  Thus, it is reasonable to conclude that Mrs. Lewis would not have consented to having the TVT implanted had she been warned of those risks.

The only remaining hurdle to proving causation is demonstrating that the TVT caused Mrs. Lewis's injuries.  *See Ledesma*, 242 S.W.3d at 46 (defining a "producing cause" as "a substantial factor in bringing about an injury, and without which the injury would not have occurred").  Dr. Zimmern's testimony is right on point.  He testified that the cause of Mrs. Lewis's injuries was "the presence of the tape," referring to the TVT.[205]  The mechanism of injury is irrelevant to this causation analysis, because Mrs. Lewis would not have received the TVT at all if the TVT had been accompanied by proper warnings.  Dr. Zimmern's testimony, therefore, establishes that the TVT was a "substantial factor" in Mrs. Lewis's injuries.

The trial court's initial grant of summary judgment focused only on whether Dr. Boreham had relied on the IFU or patient brochures in deciding whether to recommend the TVT.  The court did not address Plaintiff's alternate causation theory, that Dr. Boreham was unable to obtain fully informed consent due to the absence of certain warnings.[206]  Plaintiff raised the informed consent argument again in a motion for reconsideration under Rule 54(b), but the court denied that

---

[204] *Id.* at 2021-22.
[205] App. Vol. IX at 3708 (95:4-18).
[206] App. Vol. V at 2184-85.

motion.  The court held that because Dr. Boreham testified that she had not read the TVT warnings since 2002, "[a]ny better warning … would not have reached Dr. Boreham."[207]

The trial court failed to appreciate that this <u>is not</u> a case where the physician did not read the IFU.  Dr. Boreham testified that she read the IFU for the TVT in 2002 before using it.[208]  The mere fact that Dr. Boreham did not read the IFU before implanting the TVT in Mrs. Lewis should not entitle Ethicon to summary judgment.  Giving the Plaintiff all reasonable inferences, one could reasonably conclude that had the IFU contained the warnings at issue in 2002, Dr. Boreham would have obtained that knowledge and would have applied it in the future.  For these reasons, the district court erred in dismissing Mrs. Lewis's failure-to-warn claim on summary judgment, and this Court should remand the case for a new trial.

## IV.  Under Texas law, design-defect plaintiffs in drug and medical device cases are not required to prove a safer alternative design.

Plaintiff's final issue is one this Court should address if the Court remands the case based on Plaintiff's arguments in Section I or II, meaning that Plaintiff's design-defect claim will be re-tried.  *See Drakeford*, 675 F.3d at 406; *Levy*, 589 F.3d at 716 (allowing for review of issues likely to recur on remand).

---

[207] App. Vol. VI at 2458.
[208] App. Vol. V at 1910, 1922 (60:21-24, 218:12-19).

Section 82.005 of the Texas Civil Practices & Remedies Code reads in pertinent part as follows:

> (a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:
>
> (1) there was a safer alternative design; and
>
> (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.
>
> ***
>
> (d) This section does not apply to:
>
> (1) a cause of action based on a toxic or environmental tort as defined by Sections 33.013(c)(2) and (3); or
>
> (2) a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 321).

Tex. Civ. Prac. & Rem. Code § 82.005.[209]

The language in Section 82.005(d)(2) demonstrates legislative intent to exempt plaintiffs in drug and medical device cases from the requirement to prove a safer alternative design. However, the trial court held—reversing itself—that Mrs. Lewis had to prove a safer alternative design to establish a design defect under Texas law.[210] The court viewed the statute as leaving the issue to the common law, and it viewed the common law as requiring all design-defect plaintiffs to make this

---

[209] The full text of this statute is attached as an Addendum.
[210] App. Vol. VI at 2464.

showing—even though no Texas case has directly analyzed the issue. If this Court remands the design defect claim, it should reverse that decision.

**A. Standard of review**

Plaintiff's argument presents a purely legal issue, based on statutory interpretation. Therefore, this Court's standard of review is *de novo*. *Pliler v. Stearns*, 747 F.3d 260, 263 (4th Cir. 2014).

**B. When the Texas Legislature enacted Section 82.005, there was no requirement that a design-defect plaintiff prove a safer alternative design.**

When Section 82.005 went into effect in September 1993, Texas common law <u>did not</u> require design-defect plaintiffs to prove a safer alternative design. This point is important in determining legislative intent. Because the legislature imposed a new requirement on most plaintiffs, the logical conclusion is that Section 82.005(d) was intended to exempt drug and device plaintiffs from that new requirement.

One of the seminal Texas cases regarding design defects was *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex. 1980). In *Boatland*, the plaintiffs were family members of a man killed in a boat accident. They argued that the boat lacked a necessary "kill switch" that would cause the motor to turn off during an accident. *Id.* at 745. As the court wrote, "when the plaintiff alleges that a product was defectively designed because it lacked a specific feature, attention may

58

become focused on the feasibility of that feature [and] the capacity to provide the feature without greatly increasing the product's cost or impairing usefulness." *Id.* at 746. Thus, the Supreme Court upheld the trial court's decision to <u>allow</u> <u>evidence</u> about the feasibility the kill switch. *Id.* at 748-49. The *Boatland* court did not require proof of a safer alternative design. Instead, the court included evidence of a safer design among the factors a jury "may consider" in weighing the product's utility against its risks. *Id.* at 746.

     Other pre-statute cases confirmed that Texas common law views evidence of safer alternative designs as merely one factor to consider in a design defect case. In 1992, the year before the new statute, a Texas Court of Appeals case assessed the law of strict liability-design defect claims and laid out several considerations that are part of the risk-benefit analysis used to determine whether a product is "unreasonably dangerous." *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 732 (Tex. App.–Dallas 1992). Regarding alternative designs, the court wrote that "[t]he defectiveness of the product in question is determined in relation to safer alternatives, and evidence of the actual use of, or capacity to use, the safer alternatives is relevant." *Id.* In 1991, the Texas Supreme Court wrote that "[i]n balancing the overall risk and utility of a product, the fact finder in a products liability suit <u>may consider</u> the availability or nonavailability of

feasible alternatives." *Owens-Corning Fiberglas Corp. v. Caldwell*, 818 S.W.2d 749, 752 (Tex. 1991) (emphasis added).

These pre-statute cases treated the safer alternative design issue as part of the inquiry, but never as a necessary element. *See Turner v. General Motors Corp.*, 584 S.W.2d 844, 850-51 (Tex. 1979) (approving a jury instruction that did not reference the need to prove safer alternative design).

Against this body of pre-statute law stands a sentence from a 1995 case stating that "if there are no safer alternatives, a product is not unreasonably dangerous as a matter of law." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995), citing *Boatland*, 609 S.W.2d at 748. Although the court cited *Boatland* for that proposition, that citation was simply wrong. As discussed, nothing in *Boatland* <u>required</u> that a plaintiff prove a safer alternative design. *See Boatland*, 609 S.W.2d at 745-49.

Although the trial court based its decision on "the common law as it existed <u>before</u> the enactment of section 82.005," the trial court considered *Caterpillar* and other <u>subsequent</u> cases to be dispositive.[211] As discussed below, the key issue for statutory interpretation is legislative intent. The Legislature's actions could only have been guided by the law as it existed at the time—which did not require proof of a safer alternative design.

---

[211] App. Vol. VI at 2462-63 (emphasis added).

**C. Through Section 82.005(d), the Legislature expressed a clear intent to exempt drug and device cases from the new requirement of proving a safer alternative design.**

"When interpreting a statutory provision, a court must ascertain and effectuate the legislative intent." *Texas Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004). "If the statutory text is unambiguous, a court must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results." *Id.* at 177. Here, the statute's plain language dictates that drug and medical device cases are to be treated differently. Tex. Civ. Prac. & Rem. Code § 82.005(d)(2). Thus, the only "absurd result" would be interpreting the statute to require the same standards of proof in all design-defect cases.

The plain language says that the section "does not apply to" a "drug or device case." Tex. Civ. Prac. & Rem. Code § 82.005(d)(2). There are only two possible interpretations of that provision. One is that the statute has no impact on drug and device cases, and the state of the law as of August 31, 1993, continues. The other is that the Legislature affirmatively exempted drug and device cases from the requirement to prove a safer alternative design. Plaintiff's conclusion prevails by either conception, but this Court should adopt the second interpretation and conclude that the Legislature affirmatively rejected the safer alternative design requirement for drug and medical device cases.

61

When Section 82.005 went into effect, there was no requirement to prove a safer alternative design.  Then, Section 82.005 laid out precisely when it was, or was not, necessary to prove a safer alternative design.  Plaintiffs in most design defect cases must prove a safer alternative design, but the statute <u>expressly exempts</u> plaintiffs in drug and medical device cases from that requirement.  *See* Tex. Civ. Prac. & Rem. Code § 82.005(a) & (d).  Thus, the most logical interpretation is that the Legislature made an affirmative decision that such proof was not needed in drug and medical device cases.

A canon of statutory interpretation is that courts "give effect to all its words and, if possible, do not treat any statutory language as mere surplusage."  *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006).  Concluding that plaintiffs in drug and medical device cases have to prove a safer alternative design essentially renders subsection (d) of the statute meaningless, and this Court should avoid that result.

Because statutory language answers the question, the Court need not look to legislative history.  *See Att'y Gen. of Texas v. Farmers Ins. Exchange*, 411 S.W.3d 139, 145 (Tex. App.–Austin 2013) (stating that courts "may not look to extrinsic aids such as legislative history unless the plain language of the statute is ambiguous").  However, if the Court believes that an ambiguity exists, the House Research Organization's Bill Analysis offers further support for Plaintiff's position.  After describing the new, heightened, standards of proof for design

defect plaintiffs, the analysis states: "Exempted from this provision would be drugs and medical devices, as defined in the federal Food, Drug and Cosmetic Act."[212] Two words are important. One is "exempted." That word evinces a desire by the Legislature not to impose on drug and medical device plaintiffs those same requirements that were being imposed on other claimants. The other key word is "provision." This word indicates that drug and device claimants were being exempted from the specific requirements of Section (a), rather than having their claim decided under the common law.

### D. The Texas Supreme Court has not addressed this issue, and none of the case law contrary to Plaintiff's position has analyzed the issue at all.

This Court's role, as a federal court interpreting state law, is to apply the law as stated by the Texas Supreme Court. *See Fontenot v. Taser Int'l Inc.*, 736 F.3d 318, 336 (4th Cir. 2013) (stating that in a diversity case, "our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue"). The Texas Supreme Court has not decided the issue presented.

It does not appear that any Texas appellate court has <u>analyzed</u> whether plaintiffs in strict liability-design defect cases based on drugs or medical devices must prove a safer alternative design. Two Texas Court of Appeals cases

---

[212] App. Vol. VI at 2410.

63

involving drugs or medical devices have stated, <u>without any analysis or reference to Section 82.005(d)(2)</u>, that proving a safer alternative design is necessary. *See Merck & Co., Inc. v. Garza*, 277 S.W.3d 430, 440 (Tex. App.–San Antonio 2008), *overruled on other grounds by Merck & Co., Inc. v. Garza*, 347 S.W.3d 256 (Tex. 2011); *Brockert v. Wyeth Pharms., Inc.*, 287 S.W.3d 760, 769 (Tex. App.–Houston 2009).[213]  Federal trial courts that have required a safer alternative design have cited *Garza* or *Brockert*, also without analyzing the issue. *See, e.g.*, *Rojas v. Teva Pharms. USA, Inc.*, 920 F. Supp. 2d 772, 779 (S.D. Tex. 2013).

By contrast, legal scholars and commentators who have carefully examined Section 82.005 have concluded that the Legislature intended to exempt plaintiffs in drug and device cases from proving a safer alternative design. *See, e.g.*, Jeffrey Diamant, *Texas Senate Bill 4: Product Liability Legislation Analyzed*, 31 Hous. L. Rev. 921 (1994).  Author Jeffrey Diamant concluded that "[a] plain reading of the statute makes clear to the reader that the legislature intended for manufacturers of drugs and medical devices to be exempted <u>only from the new standard of proving safer alternative design</u>, and not to be exempted from liability altogether."[214]  *Id.* at

---

[213] As of June 2, 2014, the trial court's initial decision on this issue was the only decision retrieved through a Westlaw search of all state and federal courts for "82.005(d)."

[214] The author was not merely pushing a plaintiff-friendly viewpoint.  He later advocated that Texas abolish strict liability claims for design defects. *Id.* at 948-49.

64

948 (emphasis added).  Thus, "[t]he effect of this provision is that cases involving drugs or medical devices will have to be tried under the risk-utility standard."  *Id.*

Additionally, a Texas practice guide from 2013 states as follows: "The requirement to show a 'safer alternative design' does not apply, however, to toxic and environmental torts, or to cases involving a prescription drug or medical device."  TXPG-PI § 4:348 (emphasis added).  Thus, a publication directed to Texas lawyers states that they do not need to prove a safer alternative design in a drug or medical device case.

This Court should follow the plain language of the statute and hold that Mrs. Lewis does not need to prove a safer alternative design to the TVT when her case is re-tried.

## <u>CONCLUSION</u>

For the reasons explained above, Plaintiff-Appellant Carolyn Lewis respectfully requests the following rulings from this Court:

- Mrs. Lewis submitted sufficient evidence to avoid a directed verdict, or would have submitted sufficient evidence if the trial court had not erroneously limited Dr. Klinge's testimony.  Therefore, the case will be remanded for a new trial.

- The trial court erred when it dismissed Mrs. Lewis's failure-to-warn claim on summary judgment.  Therefore, the case will be remanded with instructions to allow Mrs. Lewis to present evidence on her failure-to-warn claim when the case is re-tried.

- Texas law does not require design-defect plaintiffs in drug and medical device cases to prove a safer alternative design.  Therefore, this Court instructs the trial court that no such proof will be necessary when the case is re-tried.

Respectfully Submitted,

/s/Adam S. Davis

Adam S. Davis
WAGSTAFF & CARTMELL LLP
4740 Grand Ave., Suite 300
Kansas City, MO  64112
Phone: 816-701-1100
Fax: 816-531-2372
adavis@wcllp.com

Julie L. Rhoades
MATTHEWS & ASSOCIATES
2905 Sackett St.
Houston, TX  77098
Phone: 713-535-7172
Fax: 713-535-7132
jrhoades@thematthewslawfirm.com

**Attorneys for Carolyn Lewis**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 13,972 words, excluding the parts of the brief

  exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/Adam S. Davis
**Attorney for Carolyn Lewis**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing brief on June 3, 2014, through the Court's CM-ECF electronic filing system, thereby sending copies of this brief to all counsel of record for this appeal.

/s/Adam S. Davis
**Attorney for Carolyn Lewis**

## <u>ADDENDUM INDEX</u>

Texas Civ. Prac. & Rem. Code § 82.005 ............................................................ A-1

Westlaw.

V.T.C.A., Civil Practice & Remedies Code § 82.005                    Page 1

c

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Civil Practice and Remedies Code (Refs & Annos)
    Title 4. Liability in Tort
      Chapter 82. Products Liability (Refs & Annos)
        → → **§ 82.005. Design Defects**

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:

  (1) there was a safer alternative design; and

  (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.

(b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:

  (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

  (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

(c) This section does not supersede or modify any statute, regulation, or other law of this state or of the United States that relates to liability for, or to relief in the form of, abatement of nuisance, civil penalties, cleanup costs, cost recovery, an injunction, or restitution that arises from contamination or pollution of the environment.

(d) This section does not apply to:

  (1) a cause of action based on a toxic or environmental tort as defined by Sections 33.013(c)(2) and (3); or

  (2) a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 321).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-1

V.T.C.A., Civil Practice & Remedies Code § 82.005                    Page 2

(e) This section is not declarative, by implication or otherwise, of the common law with respect to any product and shall not be construed to restrict the courts of this state in developing the common law with respect to any product which is not subject to this section.


CREDIT(S)

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.


Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-2