No. 14-1244

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAROLYN LEWIS,

*Plaintiff-Appellant*,

v.

JOHNSON & JOHNSON and ETHICON, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of West Virginia

## BRIEF OF APPELLEES JOHNSON & JOHNSON
## AND ETHICON, INC.

CHARLES C. LIFLAND                STEPHEN D. BRODY
O'MELVENY & MYERS LLP              DAVID K. ROBERTS
400 South Hope Street             O'MELVENY & MYERS LLP
18th Floor                        1625 Eye Street, NW
Los Angeles, California  90071    Washington, D.C.  20006
(213) 430-6000                    (202) 383-5300

*Counsel for Defendants-Appellees Johnson & Johnson and Ethicon, Inc.*

*[Additional counsel listed on inside cover]*

July 14, 2014

DAVID B. THOMAS                     CHRISTY D. JONES
PHILIP J. COMBS                     BUTLER SNOW LLP
THOMAS COMBS & SPANN, PLLC          1020 Highland Colony Parkway
Post Office Box 3824                Suite 1400
Charleston, West Virginia  25338    Ridgeland, Mississippi  39157
(304) 414-1800                      (601) 985-4523

*Counsel for Defendants-Appellees Johnson & Johnson and Ethicon, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1244__      Caption: __Carolyn Lewis v. Johnson & Johnson et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Johnson & Johnson__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO

2.      Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                             ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: Charles C. Lifland                    Date:    7/14/2014

Counsel for: Johnson & Johnson

## CERTIFICATE OF SERVICE
**************************
I certify that on    7/14/2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Charles C. Lifland                              7/14/2014
(signature)                                      (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1244__    Caption: __Carolyn Lewis v. Johnson & Johnson et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ethicon, Inc._____
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                          ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
         Ethicon, Inc. is a wholly owned subsidiary of appellee Johnson & Johnson.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: Charles C. Lifland_____      Date: _____7/14/2014_____

Counsel for: Ethicon, Inc._____

## CERTIFICATE OF SERVICE
*************************

I certify that on _____7/14/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Charles C. Lifland_____                    _____7/14/2014_____
       (signature)                                           (date)

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE AND FACTS ........................................2

    A.    Tension-free Vaginal Tape (TVT).......................................3

    B.    Plaintiff's Serious and Worsening SUI ..............................4

    C.    Dr. Boreham's Treatment ...................................................5

    D.    Pretrial Proceedings and Rulings.......................................9

    E.    Trial and Judgment in Defendants' Favor ......................11

SUMMARY OF ARGUMENT ..........................................................13

STANDARD OF REVIEW ................................................................17

ARGUMENT .....................................................................................17

I.    The District Court Correctly Dismissed Plaintiff's Warning Claim Because She Failed to Present Evidence That Any Inadequacy in TVT's Warnings Caused Her Alleged Injuries. ...........17

II.    The District Court Correctly Dismissed Plaintiff's Design-Defect Claim Because She Presented Insufficient Evidence that a Defect in TVT Caused Her Alleged Injuries. .......................................25

    A.    Texas Common Law Requires Plaintiff to Show that a Specific Defect Caused Her Alleged Injuries. ...............25

    B.    Plaintiff Failed to Present Evidence that a Defective Condition of TVT Caused Her Alleged Injuries.........30

- i -

# TABLE OF CONTENTS
(continued)

**Page**

III.  The District Court Acted Within Its Discretion When It
      Sustained Defendants' Objections to Certain Testimony from
      Dr. Klinge. ...................................................................................40

IV.   The District Court Correctly Ruled that Texas Common Law
      Requires Plaintiff to Prove a Safer Alternative Design to TVT............46

CONCLUSION ................................................................................51

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackermann v. Wyeth Pharms.*,
  526 F.3d 203 (5th Cir. 2008) .................................................................. *passim*

*Alexander v. Smith & Nephew, P.L.C.*,
  98 F. Supp. 2d 1310 (N.D. Okla. 2000) ............................................................44

*American Tobacco Co., Inc. v. Grinnell*,
  951 S.W.2d 420 (Tex. 1997) .................................................................. 28, 48

*Anderson v. Siemens Corp.*,
  335 F.3d 466 (5th Cir. 2003) .................................................................. 15, 26

*Armstrong Rubber Co. v. Urquidez*,
  570 S.W.2d 374 (Tex. 1978) .................................................................. 26, 28, 29

*BIC Pen Corp. v. Carter*,
  346 S.W.3d 533 (Tex. 2011) ............................................................................38

*Bigelow v. N.Y. Lighter Co., Inc.*,
  2005 U.S. Dist. LEXIS 47871 (W.D. Tex. 2005).................................................29

*Bostrom Seating, Inc. v. Crane Carrier Co.*,
  140 S.W.3d 681 (Tex. 2004) ............................................................................34

*Brockert v. Wyeth Pharms., Inc.*,
  287 S.W.3d 760 (Tex. App.—Houston 2009, no pet.) ....................................48

*Bryte v. Am. Household, Inc.*,
  429 F.3d 469 (4th Cir. 2005) .................................................................. 17, 33

*Caterpillar, Inc. v. Shears*,
  911 S.W.2d 379 (Tex. 1995) .................................................................. 48, 50

*Centocor, Inc. v. Hamilton*,
  372 S.W.3d 140 (Tex. 2012) .................................................................. 14, 17, 18, 21

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Clark v. Takata Corp.*,
   192 F.3d 750 (7th Cir. 1999) ........................................................................24

*Clarke v. Schofield*,
   632 F. Supp. 2d 1350 (M.D. Ga. 2009) ............................................................44

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*,
   271 S.W.3d 238 (Tex. 2008) ...........................................................................38

*Conklin v. Novartis Pharms. Corp.*,
   2012 WL 4127301 (E.D. Tex. 2012)................................................................50

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ..........................................................................17

*Cray Commc'ns, Inc. v. Novatel Comp. Sys., Inc.*,
   33 F.3d 390 (4th Cir. 1994) ...........................................................................29

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) ..........................................................................17

*Duff v. Yelin*,
   751 S.W.2d 175 (Tex. 1988) ...........................................................................32

*Dyer v. Danek Med. Inc.*,
   115 F. Supp. 2d 732 (N.D. Tex. 2000) .............................................................49

*Ethicon Endo-Surgery, Inc. v. Meyer*,
   249 S.W.3d 513 (Tex. App.—Fort Worth 2007, no pet.) .................. 18, 20, 21

*Ford Motor Co. v. Miles*,
   141 S.W.3d 309 (Tex. App.—Dallas 2004, pet. denied)................................26

*Ford Motor Co. v. Ridgway*,
   135 S.W.3d 598 (Tex. 2004) ................................................... 29, 37, 46

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Fossman v. Novartis Pharms. Corp.,*
  509 F. App'x 215 (4th Cir. 2013) ...................................................................24

*Gen. Motors Corp. v. Iracheta,*
  161 S.W.3d 462 (Tex. 2005) ..........................................................................36

*Gerber v. Hoffman-La Roche, Inc.,*
  392 F. Supp. 2d 907 (S.D. Tex. 2005) ...........................................................49

*Goodner v. Hyundai Motor Co., Ltd.,*
  650 F.3d 1034 (5th Cir. 2011) .................................................................. 29, 30

*Guenther v. Novartis Pharms. Corp.,*
  2013 WL 1498162 (M.D. Fla. 2013) .............................................................25

*Harbor Court Assocs. v. Leo A. Daly Co.,*
  179 F.3d 147 (4th Cir. 1999) ..........................................................................49

*Hernandez v. Tokai Corp.,*
  2 S.W.3d 251 (Tex. 1999) ................................................................... 27, 48, 50

*iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.,*
  414 S.W.3d 842 (Tex. App.—Houston 2013, pet. pending)................... 25, 26

*In re Diet Drugs Prods. Liab. Litig.,*
  2001 WL 454586 (E.D. Pa. 2001).................................................................44

*In re Norplant Contraceptive Prods. Liab. Litig.,*
  955 F. Supp. 700 (E.D. Tex. 1997) ...............................................................21

*Ins. Co. of N. Am. v. Myers,*
  411 S.W.2d 710 (Tex. 1966) .................................................................... 38, 46

*Jackson v. Consolidation Coal Co.,*
  21 F.3d 422, 1994 WL 89801 (4th Cir. 1994) (table) ....................................24

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Koenig v. Purdue Pharma Co.*,
  435 F. Supp. 2d 551 (N.D. Tex. 2006) ............................................................21

*Kyser v. Harrison*,
  908 So. 2d 914 (Ala. 2005) ................................................................ 43, 44

*Licciardi v. TIG Ins. Group*,
  140 F.3d 357 (1st Cir. 1998) ...............................................................45

*Lucas v. Tex. Indus., Inc.*,
  696 S.W.2d 372 (Tex. 1985) (on reh'g)....................................................... 26, 38

*Mack Trucks, Inc. v. Tamez*,
  206 S.W.3d 572 (Tex. 2006) ............................................................. 15, 26

*McKay v. Novartis Pharms. Corp.*,
  934 F. Supp. 2d 898 (W.D. Tex. 2013) .............................................................32

*McNeil v. Wyeth*,
  462 F.3d 364 (5th Cir. 2006) ...............................................................23

*Merck & Co. v. Ernst*,
  296 S.W.3d 81 (Tex. App.—Houston 2009, pet. denied)........................ 26, 39

*Merck & Co., Inc. v. Garza*,
  277 S.W.3d 430 (Tex. App.—San Antonio 2008)............................................48

*Merrell Dow Pharms., Inc. v. Havner*,
  953 S.W.2d 706 (Tex. 1997) ...............................................................34

*Nissan Motor Co., Ltd. v. Armstrong*,
  145 S.W.3d 131 (Tex. 2004) ......................................................... 15, 25, 32

*Overshown v. State*,
  329 S.W.3d 201 (Tex. App.—Houston 2010, no pet.) ...................................49

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Parker v. Emp'rs Mut. Liab. Ins. Co.*,
  440 S.W.2d 43 (Tex. 1969) ...............................................................27

*Porterfield v. Ethicon, Inc.*,
  183 F.3d 464 (5th Cir. 1999) ........................................... 14, 19, 20, 21

*Pustejovsky v. PLIVA, Inc.*,
  623 F.3d 271 (5th Cir. 2010) ...................................................... 19, 20

*Rojas v. Teva Pharm. USA, Inc.*,
  920 F. Supp. 2d 772 (S.D. Tex. 2013) ................................................49

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
  318 F.3d 592 (4th Cir. 2003) ...................................................... 16, 45

*Shelton v. Sargent*,
  144 S.W.3d 113 (Tex. App.—Fort Worth 2004, pet. denied) ............... 37, 46

*Solomon v. Bristol-Myers Squibb Co.*,
  916 F. Supp. 2d 556 (D.N.J. 2013) ............................................. 20, 21

*Stevenson v. City of Seat Pleasant*,
  743 F.3d 411 (4th Cir. 2014) ...........................................................24

*Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*,
  848 S.W.2d 724 (Tex. App.—Dallas 1992, writ denied) ...............................29

*Townley v. Norfolk & W. R. Co.*,
  887 F.2d 498 (4th Cir. 1989) ...........................................................24

*Transcon. Ins. Co. v. Brigg's Equip. Trust*,
  321 S.W.3d 685 (Tex. App.—Houston 2010, no pet.) ...................................29

*U.S. ex rel. Carter v. Halliburton Co.*,
  710 F.3d 171 (4th Cir. 2013) ...........................................................47

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Uniroyal Goodrich Tire Co. v. Martinez,*
  977 S.W.2d 328 (Tex. 1998) ...................................................................... 48, 50

*United States v. Davis,*
  690 F.3d 226 (4th Cir. 2012) ........................................................ 17, 41

*United States v. Sriyuth,*
  98 F.3d 739 (3d Cir. 1996) ................................................................ 41

*Weisgram v. Marley Co.,*
  528 U.S. 440 (2000) ......................................................................... 17

*Williams v. Bell,*
  402 S.W.3d 28 (Tex. App.—Houston 2013, pet. denied) .............................. 28

*Wyeth-Ayerst Lab. Co. v. Medrano,*
  28 S.W.3d 87 (Tex. App.—Texarkana 2000, no pet.) ..................................... 21

**Statutes and Rules**

Fed. R. Civ. P. 26(a)(2)(B)(i) ........................................................... 16, 45

Fed. R. Civ. P. 37(c)(1) ................................................................... 16, 45

Fed. R. Evid. 403 ............................................................................ 40

Tex. Civ. Prac. & Rem. Code § 82.005 ......................................... *passim*

**Other Authorities**

Acts 1993, 73rd Leg., ch. 5, §§ 3(b), 4 ................................................. 48

Dorland's Illustrated Medical Dictionary (32d ed. 2012) .............................. 43

Restatement (Second) of Torts § 402A ......................................... 29, 33

## STATEMENT OF JURISDICTION

Plaintiff's jurisdictional statement is accurate, except that it neglects to mention that all other defendants were dismissed before trial. JA41.[1]

## STATEMENT OF THE ISSUES

1.    Did the district court correctly conclude that Plaintiff cannot prevail on her claim that Ethicon's warnings regarding the TVT medical device were inadequate, where she failed to show that any inadequacy in those warnings caused her alleged injuries?

2.    Did the district court correctly conclude that Plaintiff cannot prevail on her claim that TVT is defectively designed, where she presented insufficient evidence that any defective condition of TVT caused her alleged injuries?

3.    Did the district court err in sustaining certain of Defendants' objections to opinion testimony from Dr. Uwe Klinge?

4.    If this Court determines that a remand is necessary to resolve Plaintiff's design-defect claim, did the district court correctly rule that she must show a safer alternative design to the TVT device?

---

[1] Citations to "JA__" refer to the joint appendix.

## STATEMENT OF THE CASE AND FACTS

For nearly two decades, Plaintiff Carolyn Lewis suffered from stress urinary incontinence ("SUI"), a condition that causes the involuntary loss of urine during everyday activities like sneezing, coughing, laughing, and exercise.  JA2752.[2]  By 2009, Plaintiff's SUI had worsened to the point where she suffered urine leakage 10 to 15 times a day and was forced to wear absorbent pads.  She sought treatment from Muriel Boreham, M.D., an experienced urogynecologist.  Dr. Boreham treated Plaintiff's SUI by implanting a prescription-only medical device called Tension-free Vaginal Tape ("TVT") that supports the urethra to prevent or reduce the symptoms of SUI.  Dr. Boreham has performed hundreds of successful surgeries with the TVT device, which Plaintiff's own expert witness called the "gold standard" for surgically treating SUI.  JA3187-88.

Plaintiff nevertheless alleged that defects in TVT's design caused her to suffer pain and dyspareunia (pain during sex).  She also alleged that Ethicon's accompanying Instructions for Use ("IFU") did not adequately warn Dr. Boreham of certain alleged complications associated with TVT,

---

[2] Facts relating to the district court's entry of judgment are recited in the light most favorable to Plaintiff, the nonmovant below.  *See infra* at 17.

notwithstanding Dr. Boreham's testimony that, in advising Plaintiff of the risks associated with the surgery, she did not refer to or rely upon the IFU. JA132, JA1926.  Indeed, Dr. Boreham had not even read the IFU in the seven years prior to Plaintiff's surgery, JA126, JA131, and to this day stands by her medical judgment that "the benefits of surgery with TVT outweigh[ed] [its] potential risk" to Plaintiff.  JA132.

### A.    Tension-free Vaginal Tape (TVT)

TVT has been marketed in the United States by Ethicon, Inc., a subsidiary of Johnson & Johnson, since 1998.  JA93, JA2823.  TVT is made out of Prolene mesh.  JA94.  Mid-urethral slings like TVT are the most widely used surgical treatment for SUI, JA2824, and have been endorsed as safe and acceptable by the American Urogynecology Society, the International Urogynecology Society, and the American Urology Society. JA2854-55.  More than 100 randomized clinical trials support TVT's safety and efficacy.  JA3658-59.  It is the most-studied SUI device, and, as Ethicon medical director Axel Arnaud, M.D., explained, there is "probably no other medical device in any other surgery that receives such an amount of clinical data."  JA3659; *see* JA3423.  One such study tracked patients for 17 years. JA3660.

Each TVT unit is packaged with the IFU, a document listing general instructions, warnings, adverse effects, and contraindications.  JA93-99.[3] When Plaintiff underwent surgery to implant TVT in November 2009, the IFU warned of numerous possible complications, including transitory foreign body response, inflammation, infection, urinary tract obstruction, retropubic bleeding, and punctures or lacerations of vessels, nerves, bladder, and bowel.  JA96-97.

## B.    Plaintiff's Serious and Worsening SUI

Plaintiff's SUI began in 1991.  JA109.  Since 2003 or 2004, she wore pads on a daily basis, and by 2009, her SUI had worsened to the point that she experienced urine leakage 10 to 15 times a day—when she coughed, exercised, cleared her throat, sneezed, lifted things, laughed, or stood up. JA110-11, JA4611-12.  And the leaks were "getting … worse."  JA4611.  This interfered with intimate life with her husband.  JA110.  It bothered her "greatly" and was "humiliating."  JA4611, JA113.  Eighteen years after her SUI began, she had had enough and went to see Dr. Boreham to consider

---

[3] Plaintiff's papers cite a version of the IFU found at JA1930-36. Defendants cite the IFU found at JA93-99 because it was in effect when Plaintiff underwent surgery in 2009.

surgery.  JA109, JA111-14.  As Dr. Boreham summed up:  Plaintiff appeared "at the end of her rope."  JA134.

### C.    Dr. Boreham's Treatment

Dr. Boreham is a board-certified gynecologist with specialized training in urogynecology and female pelvic reconstruction.  JA119, JA138. She maintains a clinical practice in urogynecology and is a clinical instructor at Baylor University Medical Center.  JA122, JA138-39.  During her fellowship, Dr. Boreham performed "several hundred" procedures using surgical mesh, and her training included the use of TVT to treat SUI. JA120-21.  As of 2013, Dr. Boreham had performed "[o]ver a thousand" surgeries to treat SUI and another condition called pelvic organ prolapse. JA123.

At the time of Plaintiff's surgery in 2009, Dr. Boreham had not reviewed TVT's IFU since her surgical fellowship in 2002.  JA131.  She does not "track the change in the language of the IFUs."  JA126.  Instead, Dr. Boreham bases her treatment decisions on her knowledge, training, experience, and ongoing review of peer-reviewed medical literature and scientific studies.  JA126.  The medical literature on TVT, Dr. Boreham noted, contains "more data than almost any other device in history."  JA126.

Indeed, while Plaintiff attempts to criticize Ethicon for its decision not to alter TVT's design, she concedes that Ethicon's decision was based on the significant clinical data supporting the safety and effectiveness of TVT. *See* Pl.'s Br. 11; *see also* JA3578. It is precisely that robust clinical data—a product of more than a decade of physicians' experience with TVT—that is most important to Dr. Boreham. JA126. She obtains data not from Ethicon, but from peer-reviewed journals and at professional meetings. JA126. Dr. Boreham elaborated: "Reps do call on me, but I rarely will use a new product based on somebody's recommendation. I typically base it on what I read in the journals." JA126.

From her training and experience, Dr. Boreham knew that TVT, like all surgically implanted devices, has risks. She knew that TVT's risks include dyspareunia (JA124-25, JA127, JA154, JA1912-13); contracture or shrinkage of mesh from the natural scarring process (JA124-25, JA130); chronic pain (JA130); nerve pain and damage or neurological deficit (JA127, JA130, JA154, JA1912); damage to pelvic structures, including muscles and nerves (JA127, JA130, JA154, JA1912); mesh erosion or extrusion (JA121, JA125, JA129-30, JA1912-13); fibrotic bridging (JA2278); the need for future surgery to remove mesh (JA129, JA1912-13); and internal organ damage

(JA125, JA130, JA1912).  Dr. Boreham also knew that "long-term readjustment" was not possible, and has seen TVT units lose particles. JA129, JA1925.

Dr. Boreham testified unequivocally that she "did not" rely on TVT's IFU when she prescribed the TVT to Plaintiff:

> Q.    … [Y]ou did not rely on the IFU in prescribing TVT to Ms. Lewis; is that right?
>
> A.    That's right, I did not.

JA132.  Indeed, she agreed that her "decision to use TVT for Ms. Lewis had nothing to do with the [IFU]," JA131, and that she "never relied on anything Ethicon did in prescribing" TVT to Plaintiff, JA1926.  She prescribed TVT to Plaintiff only after Plaintiff came to her requesting surgery, JA112-14, JA134, JA4612, and only after discussing her "symptoms, her voiding diary, her urodynamics, and physical exam.  And then our discussions on her desires."  JA131.

During those discussions, Dr. Boreham warned Plaintiff of risks of the surgery without regard to whether those risks were listed in the IFU.  JA127, JA135, JA154, JA1912-13.  Dr. Boreham testified, and contemporaneous medical records show, that she warned Plaintiff of dyspareunia, damage to

- 7 -

pelvic structures such as vessels and nerves, and erosion and the potential need for future surgeries to revise or remove the sling. JA135, JA154, JA1912-13. Plaintiff testified in her deposition that she recalled being warned of infection, incontinence, urinary retention, and that the surgery "may not work," but "d[id] not recall" what other warnings Dr. Boreham conveyed, including that she "could have pain with sex." JA116.

After full discussion of TVT surgery with Dr. Boreham, Plaintiff elected to proceed. JA135, JA154-55. Plaintiff agreed that she "had surgery with mesh based on the medical judgment" and "recommend[ation] … of Dr. Boreham." JA117. She offered no other influence on her decision and acknowledged that she never saw or relied on any Ethicon materials. JA107. For her part, Dr. Boreham "continue[s] to believe … today" that "the benefits of surgery with TVT outweigh[ed] [its] potential risk" to Plaintiff, JA132, and that "TVT was a good and safe product for Ms. Lewis," JA1926.

Plaintiff returned to Dr. Boreham for one follow-up visit six weeks after her surgery. JA132, JA137. At that time, Dr. Boreham told her that she was healing and could resume sexual activity, but that she should return if she experienced any difficulties. JA3348, JA3376-77. Even though she experienced dyspareunia at least twice in the month following that visit, she

never sought further treatment or advice from Dr. Boreham.  JA3349,

JA3377.  Nor did she seek treatment for her dyspareunia or other alleged

injuries from anyone else.  JA3378.  She did not seek medical attention even

after she saw a lawyer advertisement in late 2010 listing supposed

complications of mesh slings such as "[p]ain with sex."  JA3357-58.  She did

so only after she filed this lawsuit, when she visited Dr. Philippe Zimmern

to have her TVT explanted.  JA3378, JA3386-88.

### D.    Pretrial Proceedings and Rulings

Plaintiff filed suit in the Northern District of Texas on July 25, 2012.

She brought claims including negligence and strict liability, alleging that

TVT was defectively designed and that Ethicon did not adequately warn of

its risks.  JA51-80.  Her case was transferred to MDL No. 2327 in the

Southern District of West Virginia, and was later selected for a bellwether

trial.  JA19, JA81-83.

Following discovery, the district court awarded summary judgment

to Defendants on Plaintiff's inadequate-warning claim and several others

that she has not pursued on appeal.  *See* Summary-Judgment Order

(JA2178-95).  Addressing the warning claim, the court ruled that Plaintiff

failed to present evidence that any inadequacy in Ethicon's warnings

caused her alleged injuries. The court first recognized that Texas, like almost all states, follows the learned-intermediary rule, under which a prescription drug or medical device maker's duty to warn extends only to the prescribing physician and not to the patient directly. Plaintiff could not show causation, the court concluded, because "[a]lthough Dr. Boreham read the IFU at one time, she admits that she did not rely on it when she prescribed TVT for Ms. Lewis." JA2184. Plaintiff sought reconsideration of that ruling, but the court denied her motion. JA2457-58.

The court also granted Defendants' pretrial motions to limit testimony from several of Plaintiff's experts, including former hernia surgeon Dr. Uwe Klinge. JA2196-235. The court ruled that Dr. Klinge's opinions regarding two sets of explanted mesh samples were unreliable because Dr. Klinge failed to provide "any explanation of the method for selecting the explants or the potential error rate in the conclusions drawn" from them. JA2208-09. The court found it unnecessary to rule on Defendants' contention that Dr. Klinge lacks sufficient training or experience in pathology and so was unqualified to render explant-related opinions, which derived from his review of pathology slides. JA2208. Defendants also argued that "Dr. Klinge's specific causation opinion should be excluded," but the court

found no need to exclude such an opinion because Dr. Klinge "offers none on this topic in his report."  JA2206 n.2.

### E.    Trial and Judgment in Defendants' Favor

Trial on Plaintiff's design-defect claim began on February 10, 2014. Plaintiff alleged three defects in TVT's mesh:  (1) it is "heavyweight" and "small-pored"; (2) it ropes, frays, curls up, and loses particles while implanted (in vivo); and (3) it "degrades" once implanted.  Plaintiff further claimed that these alleged defects caused her chronic pain and dyspareunia.

Plaintiff called five experts at trial.  First, Plaintiff's pathologist, Bernd Klosterhalfen, addressed the characteristics of mesh slings, as well as material-engineering issues like mesh weight, pore size, and tensile strength.  Second, Plaintiff called Bruce Rosenzweig, a urogynecologist, to opine whether TVT mesh is suitable for permanent implantation to treat SUI.  Neither Dr. Klosterhalfen nor Dr. Rosenzweig examined or offered any opinions specific to Plaintiff.  JA2689, JA2823-24.

Third, Howard Jordi, a polymer chemist, opined that his visual inspection of mesh explanted from Plaintiff showed "cracking" on its surface, which he said was evidence that it had degraded in vivo. JA2944-45.  But he did not opine that any degradation was clinically

- 11 -

significant generally or was responsible for Plaintiff's alleged injuries specifically; indeed, he could not quantify any effect of cracking on TVT's functionality. JA3009-10. Similarly, Plaintiff's fourth expert, Dr. Zimmern, attributed Plaintiff's pain and dyspareunia to "the presence of the [TVT] tape," but could not testify to "[b]y which mechanism in the tissue she hurts." JA3741. According to Dr. Zimmern, the specific "property of th[e] tape" causing Plaintiff's pain was "anybody's guess." JA3743. He did not identify any defect in TVT at all, much less connect any such defect to Plaintiff's pain, which is an inherent risk of any SUI surgical procedure. He also suggested that other factors, such as anatomical changes and over-tensioning, could be responsible for her pain, and agreed that dyspareunia has many causes. JA3743, JA3755-56.

Finally, Plaintiff called Dr. Klinge. He is not a pathologist, did not complete a residency or fellowship in pathology, and is not board-certified in pathology. JA3175-77. The hospital where he works does not permit him to sign pathology reports. JA385, JA3178. Nonetheless, Plaintiff sought to elicit opinions based on pathology slides of Plaintiff's explanted mesh. After providing Plaintiff substantial leeway to elicit testimony, the court

sustained some of Defendants' objections to his pathology-based opinions. JA3170-74.

Defendants moved for judgment as a matter of law at the close of Plaintiff's case. After full briefing and oral argument, the court granted the motion. *See* Directed-Verdict Ruling (JA3854-60). Without "weigh[ing] the evidence or assess[ing] the credibility of any witness," the court concluded that "the plaintiff has failed to proffer any evidence from which a reasonable jury could find that any proven defect in the TVT medical device caused Miss Lewis's injuries." *Id.* (JA3855-56). The court also concluded that no evidence supported a punitive damages award. *Id.* (JA3860). The court then entered an order directing final judgment for Defendants. JA4986-87.

## SUMMARY OF ARGUMENT

The district court's judgment should be affirmed. The court applied settled Texas law to the full evidentiary record below, correctly concluding that Plaintiff's evidence was legally insufficient to prove the essential element of causation.

Plaintiff's burden on her failure-to-warn claim required her to prove both that TVT's warnings were inadequate and that Ethicon's failure to

provide adequate warnings caused her injuries. *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 170-72 (Tex. 2012). Under the learned-intermediary rule, Plaintiff had to prove that an adequate warning "would have changed [her] prescribing physician['s] decision" to use the device. *Id.* at 172. But Plaintiff's physician, Dr. Boreham, did not refer to or rely on risk information Ethicon provided concerning TVT. Her decision to use TVT in Plaintiff's surgery "had nothing to do with the" device's warnings, but was instead based on her knowledge and experience informed by her extensive clinical practice and ongoing review of peer-reviewed literature. JA131-32, JA1926. All this knowledge and experience endowed Dr. Boreham with keen awareness of each of the risks at issue. Under Texas law, Plaintiff's claim therefore fails. *See Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 468 (5th Cir. 1999) (per curiam) (affirming judgment for defendant where prescriber did not review product labeling but instead relied on literature and experience for prescribing decision, and was aware of relevant risks).

Plaintiff argues that, had she received additional warnings from Dr. Boreham, she might have elected not to proceed with surgery. This speculation is irrelevant to the legal issue before the Court. Texas law requires proof not that additional warnings would have changed Plaintiff's

- 14 -

mind, but that they would have changed Dr. Boreham's advice to Plaintiff and decision to use TVT.  *Ackermann v. Wyeth Pharms.*, 526 F.3d 203, 208 (5th Cir. 2008).  Absent any reliance on the IFU by Dr. Boreham, Plaintiff cannot satisfy this requirement.  And in any event, to this day Dr. Boreham believes that TVT's benefits to Plaintiff outweighed its risks and that it was the correct treatment for Plaintiff's worsening SUI.  JA132, JA1926.

To prevail on her design-defect claim, Plaintiff had to prove that "a specific defect" in TVT's design caused her alleged injury.  *Nissan Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004).  Texas courts require her to present expert testimony that a defect caused the condition complained of, *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582-84 (Tex. 2006), and the testimony must be both competent and grounded in reasonable medical probability; the mere possibility of a causal link is insufficient.  *Anderson v. Siemens Corp.*, 335 F.3d 466, 475 (5th Cir. 2003).  The trial court correctly held that Plaintiff failed to satisfy this burden where even the expert who offered Plaintiff her best evidence "did not and could not say whether a defect in the TVT caused the [P]laintiff's injuries."  Directed-Verdict Ruling (JA3857).

The record amply supports this conclusion.  Plaintiff argues that various pieces of testimony taken together could support an inference that

- 15 -

a defect in TVT caused her injuries. But as the trial court correctly held, no expert made that connection. Plaintiff is thus left to argue that the trial court erred by not letting the jury make that leap on its own. Pl.'s Br. 19, 27. Texas law precludes that argument.

Nor did the trial court err in precluding certain opinions from Dr. Klinge. He lacked the specialized qualifications required to render expert opinions based on Plaintiff's pathology slides, and in any event failed to disclose such opinions before trial in violation of the expert discovery rules. *See* Fed. R. Civ. P. 26(a)(2)(B)(i), 37(c)(1); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-99 (4th Cir. 2003) (affirming exclusion of expert's opinion because opinion was not disclosed until trial). Indeed, Plaintiff cannot even show prejudice; the excluded testimony was equivocal, unhelpful, and insufficient to carry her burden.

For these reasons, the Court need not reach the question of whether Plaintiff must prove a safer alternative design to TVT in order to prevail on her design defect claim. But if the Court were to reach the issue, it should affirm the district court's ruling that she must prove a safer alternative design to TVT. Her bid for a special exception is unprecedented and ignores both the controlling common law and the statute she relies on.

## STANDARD OF REVIEW

This Court reviews the district court's judgment de novo, considering all properly admitted evidence and reasonable inferences therefrom in the light most favorable to the nonmovant. *See Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013); *Bryte v. Am. Household, Inc.*, 429 F.3d 469, 479-80 (4th Cir. 2005). Any erroneously admitted evidence is "excis[ed]," and the judgment is reviewed without regard to such evidence. *Weisgram v. Marley Co.*, 528 U.S. 440, 456-57 (2000).

This Court reviews evidentiary rulings, including those on expert testimony, for abuse of discretion. *United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012). The proponent of expert testimony bears the burden of showing its admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

## ARGUMENT

I.   **The District Court Correctly Dismissed Plaintiff's Warning Claim Because She Failed to Present Evidence That Any Inadequacy in TVT's Warnings Caused Her Alleged Injuries.**

Like nearly all other states, Texas adheres to the learned-intermediary rule. *Centocor*, 372 S.W.3d at 157-59. Under this rule, a prescription medical device manufacturer's duty to warn of risks extends only to a patient's

- 17 -

prescribing physician, who then uses her "individualized medical judgment … [and] acts as a 'learned intermediary' between manufacturer and consumer."  *Id.* at 159 (quotations omitted); *see Ethicon Endo-Surgery, Inc. v. Meyer*, 249 S.W.3d 513, 516-17 (Tex. App.—Fort Worth 2007, no pet.).  Contrary to Plaintiff's contention, the law requires far more than simple proof "that the device injured her."  Pl.'s Br. 50.  Rather, to prevail on a warning claim, a plaintiff must prove both that a device's warnings were inadequate and also that the inadequacy caused her injury—that is, "that the warning's alleged inadequacies … would have changed [the] prescribing physician['s] decision to prescribe" the device.  *Centocor*, 372 S.W.3d at 170-72.

Plaintiff failed to present evidence that any inadequacy in TVT's warnings made any difference to Dr. Boreham's decision to treat her with TVT.[4]  Indeed, the record shows just the opposite:  that Dr. Boreham did not refer to or rely on Ethicon's warnings, and that to this day Dr. Boreham

---

[4] The only warnings relevant here are those contained in TVT's IFU and not "the information in the patient brochure," as "[t]here is no evidence that Dr. Boreham relied on the TVT patient brochure in deciding to prescribe the TVT to [Plaintiff]," Summary-Judgment Order (JA2184-85), and Plaintiff did not "see or rely" on any Ethicon materials, JA107.

- 18 -

stands by her medical judgment to use TVT. The court below thus recognized the sole dispositive fact: that Dr. Boreham "did not rely on [TVT's IFU] when she prescribed the TVT for Ms. Lewis." Summary-Judgment Order (JA2184 (citing JA132)). Not only did her "decision to use TVT for Ms. Lewis ha[ve] nothing to do with the" IFU, JA131, but also she "never relied on anything Ethicon did in prescribing" TVT to Plaintiff, JA1926. Rather, Dr. Boreham based her treatment decision on her knowledge, training, experience, and ongoing review of peer-reviewed medical literature. JA126. She prescribed TVT only after Plaintiff came to her requesting surgery, JA112-14, JA134, JA4612, and only after discussing Plaintiff's symptoms and desired outcomes with her, JA131.

Warning claims fail under Texas law where, as here, the prescribing physician did not rely on the warnings given. *See Pustejovsky v. PLIVA, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (affirming judgment for defendant because prescriber "did not recall ever reading the package insert for the drug or consulting the Physician's Desk Reference"); *Porterfield*, 183 F.3d at 468 (affirming judgment for defendant because prescriber did not review Ethicon's product labeling or other literature but "[i]nstead, [the physician] relied on surgical literature, his own experience, and the experience of his

- 19 -

colleagues in weighing the risks and benefits of surgery with the mesh"). The court below thus correctly granted judgment for Defendants, as "there is no evidence that any additional or stronger warnings on the IFU would have prevented Ms. Lewis's injuries." Summary-Judgment Order (JA2184).[5]

Not only did Dr. Boreham decide to use TVT without reference to the IFU, but to this day Dr. Boreham continues to believe that the benefit of the TVT procedure outweighed its risks to Plaintiff. JA132. Even after Plaintiff's counsel marched Dr. Boreham through a list of supposed risks of TVT, Dr. Boreham testified that those supposed risks did not change her opinion that TVT was a good and safe product for Plaintiff. JA1926. In her view, TVT remains "the gold standard" and "leading surgical treatment option" for SUI. JA133. Plaintiff's claim is thus far weaker than the one dismissed in *Meyer*, where the prescribing physician "testified that he did

---

[5] Plaintiff argued below and suggests here (*see* Pl.'s Br. 56) that *Porterfield* and *Pustejovsky* are distinguishable because the physicians in those cases never read the warnings, whereas Dr. Boreham once read the IFU. But *reading* a warning at some prior point in a doctor's career does not imply *reliance on* it. The threshold question is whether Dr. Boreham relied on the IFU. *See Solomon v. Bristol-Myers Squibb Co.*, 916 F. Supp. 556, 568-69 (D.N.J. 2013) (Texas law). She "did not." JA132.

not know what he would have done [if he had received an additional warning] and could only speculate." 249 S.W.3d at 518-19.[6]

Moreover, Dr. Boreham *knew* of all the relevant risks before Plaintiff's surgery. *See supra* at 6-7. So here, as in *Porterfield*, "[b]ecause [the] surgeon was aware of the possible risks of using the mesh but decided to use it anyway," any inadequacy in the warning "was not a producing cause of [the] injury." 183 F.3d at 468; *see Centocor*, 372 S.W.3d at 171-72; *Koenig*, 435 F. Supp. 2d at 555.

Plaintiff attempts to salvage her warning claim by arguing that because Dr. Boreham acknowledged reading TVT's IFU during her fellowship—seven years before she first treated Plaintiff—a jury could conclude that "had the IFU contained the warnings at issue in 2002, Dr. Boreham would have obtained that knowledge and would have applied it in the future." Pl.'s Br. 56. Plaintiff argues that a jury could then conclude

---

[6] *See also Wyeth-Ayerst Lab. Co. v. Medrano*, 28 S.W.3d 87, 95 (Tex. App.—Texarkana 2000, no pet.); *Ackermann*, 526 F.3d at 210-12 ; *Solomon*, 916 F. Supp. 2d at 568-70; *Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551, 555-56 (N.D. Tex. 2006) (Texas law); *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 710-11 (E.D. Tex. 1997) (Texas law), *aff'd*, 165 F.3d 374 (5th Cir. 1999).

that Dr. Boreham, in turn, "would have passed on any additional warnings to Mrs. Lewis, including warnings about chronic pain, dyspareunia, and the potential need for future surgeries." *Id.* at 54. It is, Plaintiff continues, further "reasonable to conclude that Mrs. Lewis would not have consented to having the TVT implanted." *Id.* at 55.

Plaintiff's effort fails. The issue is not whether an "adequate" warning would have changed *Plaintiff's* decision; it is whether the warning "would have changed the decision *of the treating physician*." *Ackermann*, 526 F.3d at 208 (emphasis added). In this case, Dr. Boreham's testimony establishes that it would not have done so, for two independent reasons. First, Dr. Boreham neither read *nor relied on* Ethicon's IFU when she chose TVT for Plaintiff and discussed its risks with her; Dr. Boreham testified unequivocally that she relied on her long clinical experience and ongoing review of peer-reviewed literature, and *not* on any information supplied by Ethicon. JA126, JA131-32. Second, when she discussed those risks with Plaintiff, Dr. Boreham was already aware of the risks that Plaintiff alleges should have been disclosed, and she believed then as she does now that TVT was the correct treatment for Plaintiff's SUI. JA132, JA1926. Because there is no evidence that a different warning would have changed Dr.

Boreham's medical advice, Plaintiff's self-serving assertions that different medical advice would have changed her mind about having the surgery are neither here nor there.

Plaintiff's case citations are inapposite. Dr. Boreham's independent knowledge, medical judgment, and professed lack of reliance on TVT's labeling make this case very different from *McNeil v. Wyeth*, where the prescriber testified that "he would *not* have prescribed [the drug] for more than twelve weeks … had its label stated that use for longer than twelve weeks is contraindicated." 462 F.3d 364, 371-72 (5th Cir. 2006) (emphasis added). Because Dr. Boreham already knew of each of the risks at issue here and did not read or rely on the TVT labeling, *McNeil* provides no support for Plaintiff's argument.

Moreover, *McNeil* would be unavailing here even if the hypothetical question of what Plaintiff would have done if Dr. Boreham had given her additional risk information were relevant. Plaintiff conceded that she "had surgery with mesh based on the medical judgment" and "recommend[ation] … of Dr. Boreham" and offered no other influence on her decision. JA117. Plaintiff cannot concoct a factual dispute on her decision-making by pointing to contradictions in her own account (Pl.'s Br.

- 23 -

53-54).  *See Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 422 (4th Cir. 2014);

*Townley v. Norfolk & W. R. Co.*, 887 F.2d 498, 501 (4th Cir. 1989).  In addition,

Plaintiff's assertion that additional warnings would have changed her mind

is belied by the fact that she was indeed warned about dyspareunia, nerve

damage, and the possible need for revision or removal surgery.  JA135,

JA154, JA1912-13.[7]  And Dr. Boreham's medical judgment to this day is that

"TVT was a good and safe product for Ms. Lewis."  JA132-33, JA1926.

Finally, the two unpublished decisions Plaintiff cites (*see* Pl.'s Br. 52)

do not support a contrary conclusion.  Neither applied Texas law.  The first

did not apply the learned-intermediary rule and pointed to "evidence that

[the prescribing physician] would have modified" the plaintiff's treatment

if given an adequate warning.  *Fossman v. Novartis Pharms. Corp.*, 509 F.

App'x 215, 224 (4th Cir. 2013) (per curiam).  The second applied a

---

[7] Plaintiff's carefully worded affidavit does not deny any of this; it refers only to permanent pain and dyspareunia, and the certain need for multiple future surgeries.  JA2021.  In addition, Plaintiff previously denied recalling whether Dr. Boreham warned her of these risks, JA116, so she cannot rely on her affidavit to say that she now remembers not being so warned.  *See Stevenson*, 743 F.3d at 421-22; *Clark v. Takata Corp.*, 192 F.3d 750, 760-61 (7th Cir. 1999); *Jackson v. Consolidation Coal Co.*, 21 F.3d 422, 1994 WL 89801, at *2-3 (4th Cir. 1994) (table).

"presumption that, once informed by the manufacturer, physicians will share the pertinent risks with his or her patient." *Guenther v. Novartis Pharms. Corp.*, 2013 WL 1498162, at *2 (M.D. Fla. 2013). Whatever the authority for such a presumption in Florida or Georgia (the court did not cite any), it is alien to Texas law. *Cf. Ackermann*, 526 F.3d at 212-13 (no presumption that prescribing physician would "read and heed" additional warnings).

## II.    The District Court Correctly Dismissed Plaintiff's Design-Defect Claim Because She Presented Insufficient Evidence that a Defect in TVT Caused Her Alleged Injuries.

### A.    Texas Common Law Requires Plaintiff to Show that a Specific Defect Caused Her Alleged Injuries.

To prevail on a design-defect claim, Texas common law has long required a plaintiff to prove that "a specific defect" in the product caused her alleged injury. *Armstrong*, 145 S.W.3d at 137; *iLight Techs., Inc. v. Clutch City Sports & Entm't, L.P.*, 414 S.W.3d 842, 852-53 (Tex. App.—Houston 2013, pet. pending). As the Texas Supreme Court explained thirty years ago:

> a plaintiff must establish "(1) the *defective and unreasonably dangerous condition* of the defendant's product and (2) a causal connection between *such condition* and the plaintiff's injuries or damages."

*Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 377-78 (Tex. 1985) (on reh'g) (emphases added) (quoting *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex. 1978)); *see also Mack Trucks*, 206 S.W.3d at 582-84.  This rule applies to design-defect claims whether they sound in negligence or strict liability.  *Ford Motor Co. v. Miles*, 141 S.W.3d 309, 315 (Tex. App.—Dallas 2004, pet. denied).  It also applies to other product-liability claims.  *See* Tex. Civ. Prac. & Rem. Code § 82.005(a)(2) (general design-defect claim); *iLight*, 414 S.W.3d at 846 (manufacturing-defect claim).

As these cases make clear, Plaintiff must prove not only general causation, i.e., that "a substance is capable of causing a particular injury or condition in the general population," but also specific causation, i.e., that "a substance caused a particular individual's injury."  *Merck & Co. v. Ernst*, 296 S.W.3d 81, 95-96 (Tex. App.—Houston 2009, pet. denied).

To carry Plaintiff's burden Texas courts "require[] competent expert testimony and objective proof that a defect caused the condition complained of."  *Mack Trucks*, 206 S.W.3d at 583.  Expert testimony regarding causation must be competent and grounded in reasonable medical probability; the mere possibility of a causal link is insufficient. *Anderson*, 335 F.3d at 475.  The Texas Supreme Court has explained why:

- 26 -

> once the theory of causation leaves the realm of lay knowledge for esoteric scientific theories, the scientific theory must be more than a possibility to the scientists who created it. For to the scientific mind, all things are possible. And with all things possible, citizens would have no reasoned protection from the speculations of courts and juries.

*Parker v. Emp'rs Mut. Liab. Ins. Co.*, 440 S.W.2d 43, 49 (Tex. 1969).

Plaintiff asks this Court to allow her to circumvent these requirements of proof, arguing that "the trial court erred in requiring that Mrs. Lewis connect a specific defect"—rather than the device generally—"to her injuries." Pl.'s Br. 27. The jury, Plaintiff adds, should have been permitted to make this connection on its own. *Id.* at 19. Plaintiff is wrong.

Texas Civil Practice & Remedies Code § 82.005 does not support Plaintiff's argument that she is exempt from connecting her alleged injuries to a specific defect. That 1993 statute does not even state all elements of an ordinary design-defect claim. *See Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex. 1999). And while the statute itself, strictly speaking, does not apply to drugs or medical devices, Plaintiff is wrong to suggest that subsection (d)[8] somehow exempts her from the causation standard applicable to all other

---

[8] Subsection (d) of § 82.005 states that "[t]his section does not apply to … a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act."

claimants.  Pl.'s Br. 23-24.  The very next subsection provides that "[t]his section is not declarative, by implication or otherwise, of the common law with respect to any product," § 82.005(e), which for over thirty years has required a claimant to connect an injury to a particular defect.  *See Urquidez*, 570 S.W.2d at 376.  Section 82.005 did not enact a sea change in the law.  *See* JA2412 ("The bill would demand little more of plaintiffs in proving a case than existing law, while clarifying several key points in how products liability cases are handled.").

Plaintiff's reliance on *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997) is equally unavailing.  Plaintiff says that *Grinnell* "refused to require a link between the alleged defect … and the plaintiff's injury" and requires only a link between "the product" and the injury, Pl.'s Br. 26, but the decision states the opposite:  that "[a] plaintiff must establish a causal connection between *the defective condition* and the plaintiff's injuries."  951 S.W.2d at 434 (alterations and quotations omitted; emphasis added).[9]  The

---

[9] Plaintiff's selective quotations from *Grinnell* derive from that case's review of what Texas courts call a "traditional" summary judgment motion. *See* 951 S.W.2d at 425; *Williams v. Bell*, 402 S.W.3d 28, 34-35 (Tex. App.—Houston 2013, pet. denied).  To prevail on that type of motion, the defendant could not rest on "what [the plaintiff] failed to prove."  *Grinnell*,

few other decisions Plaintiff cites do not survive even passing scrutiny.[10]

Similarly, Restatement (Second) of Torts § 402A, also cited by Plaintiff, *undermines* her argument.  Under that section, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user … is subject to liability for physical harm *thereby caused*," i.e., harm caused by *a defect*, as the Texas Supreme Court has recognized.  *See Urquidez*, 570 S.W.2d at 375-76.

Finally, *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034 (5th Cir. 2011) does not ease the requirements of proof for Plaintiff's claim.  The *Goodner* plaintiffs presented expert testimony that an alleged design defect

---

951 S.W.2d at 434-35.  But where a plaintiff lacks evidence on an essential element of her claim at trial, judgment is appropriate under both Texas and federal standards.  *Cray Commc'ns, Inc. v. Novatel Comp. Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994); *accord Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (discussing "no-evidence" summary judgment motion).

[10] *See Transcon. Ins. Co. v. Brigg's Equip. Trust*, 321 S.W.3d 685, 698-700 (Tex. App.—Houston 2010, no pet.) (where claimant's theory was that product was defective because it lacked a safety feature, issue was whether absence of specific feature led to accident); *Bigelow v. N.Y. Lighter Co., Inc.*, 2005 U.S. Dist. LEXIS 47871, at *36-37 (W.D. Tex. 2005) (issue was simply whether defendant's lighter, which was one of several in vehicle, was lighter used by minor to start vehicle fire); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 731-33 (Tex. App.—Dallas 1992, writ denied) (plaintiff offered testimony from fire marshal who eliminated other potential causes and determined that specific design defect was the producing cause of fire at issue).

in an automobile seat caused the decedent to be ejected from the vehicle, thereby satisfying the requirement that the plaintiffs offer evidence on the "most technical" causation questions in the case. 650 F.3d at 1045.[11] Because of this expert testimony, the jury could conclude that the defect was a cause of death. *Id.* In stark contrast, Plaintiff's experts here offered no testimony on the technical issue of whether any of the alleged defects in TVT caused Plaintiff's pain or dyspareunia. Plaintiff has no support for her assertion that she was not required to offer competent expert testimony that a specific defect in TVT's design caused her injuries. And on this requirement, Plaintiff's proof at trial failed.

### B. Plaintiff Failed to Present Evidence that a Defective Condition of TVT Caused Her Alleged Injuries.

After reviewing the entire record, the district court held that Plaintiff failed to present sufficient evidence that her pain and dyspareunia were caused by any of the three defects she alleges: (i) the device's use of "heavyweight, small-pore" Prolene mesh; (ii) degradation of the mesh; or

---

[11] The testimony of the plaintiffs' expert linked the alleged defect all the way to the injury: he "testified that Hyundai's seat recline [the alleged defect] caused Sarah's ejection and that ejection significantly increases the risk of serious injury or death." 650 F.3d at 1044.

(iii) the use of machine-cut mesh that she says led to particle loss. Directed-Verdict Ruling (JA3854-60).[12]  On appeal, Plaintiff points primarily to expert testimony to argue that the record was sufficient to take her design-defect claim to the jury. *See* Pl.'s Br. 28-41. But the testimony from Plaintiff's experts, whether considered individually or together with all other evidence adduced at trial, does not cure her failure of proof.

As the court below recognized, the testimony from Dr. Zimmern was "[P]laintiff's best but insufficient evidence" of causation—insufficient because he "did not and could not say whether a defect in the TVT caused the [P]laintiff's injuries." Directed-Verdict Ruling (JA3857). He did not identify any defect in TVT at all. Nor could he say whether the device itself was the cause for her pain rather than, for example, anatomical issues or over-tensioning:

> Q.    And so I understand your testimony, you did diagnose, as part of your care and treatment of Carolyn Lewis, what the cause of the pain and dyspareunia was?

---

[12] Plaintiff has abandoned her contention below (*see* Dist. Ct. ECF No. 287 at 10) that TVT is defective on the ground that it caused urinary retention or voiding dysfunction. And while she appears to contend that TVT is defective because it can "rope," "curl," and "fray" (Pl.'s Br. 37, 40), she presented no evidence that those things occurred in her TVT.

> A.   The cause being *the presence of the tape. By which mechanism in the tissue she hurts, that, I don't know*.
>
> \* \* \* \* \*
>
> Q.   All right.  And what *property of that tape* was causing that pain?
>
> A.   *It's anybody's guess.*  Could be muscle changes, nerve changes, innervation, nerve entrapment, tension.  *We really don't know the answer to that question*.

JA3741, JA3743 (emphases added).  He also agreed that dyspareunia has many causes, such as age and hormone levels.  JA3755-56.

Put simply, "[i]t is not sufficient to speculate that a product caused the injuries."  Directed-Verdict Ruling (JA3858).  Rather, "a specific defect must be identified by competent evidence and other possible causes must be ruled out."  *Armstrong*, 145 S.W.3d at 137; *see Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988).  This is particularly important here, because pain, standing alone and not attributable to a specific property of TVT, does not imply even general causation.  Pain is a risk of virtually any surgically implanted device, so a non-defective device could just as easily cause pain.  *Cf. McKay v. Novartis Pharms. Corp.*, 934 F. Supp. 2d 898, 909-10 (W.D. Tex. 2013) (Texas law) (given "the present state of human knowledge," pharmaceutical products "are quite incapable of being made safe" yet, if properly prepared

and accompanied by appropriate directions and warnings, are neither defective nor unreasonably dangerous) (quoting Restatement (Second) of Torts § 402A cmt. k).  In sum, Plaintiff's "best evidence" failed to satisfy this burden of proof.  *See Bryte*, 429 F.3d at 479-80 (affirming entry of judgment for defendant at close of plaintiff's case for lack of causation in product-liability suit).

Nor does the remaining evidence support Plaintiff's theory that mesh "weight," pore size, "degradation," or particle loss caused her injuries.  Dr. Rosenzweig neither examined Plaintiff nor consulted her physicians and "explicitly stated that his opinions in this case were not related specifically to Miss Lewis."  Directed-Verdict Ruling (JA3858 (citing JA2823-24)).  And while Plaintiff relies primarily on Dr. Rosenzweig for the proposition that using laser-cut mesh would prevent particle loss, Plaintiff offered nothing to connect particle loss to her injuries.  The Ethicon documents Dr. Rosenzweig relies on—such as informal survey responses, correspondence between Ethicon employees, and engineering analyses that do not resemble real-world applications of TVT, *see* Pl.'s Br. 37-39—on their face do not satisfy Plaintiff's burden of proof.  Because they do not study whether the alleged defects have any *clinical significance* during in vivo use, they do not

even tend to show general causation, let alone the required specific causation.[13] *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004) (out-of-context quotations from plaintiff's experts failed to show existence of design defect). That leaves Dr. Rosenzweig with only his anecdotes and bare conclusion, neither of which is sufficient. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997) (scattered anecdotes and say-so are not competent expert testimony).

Similarly, Dr. Rosenzweig's anecdotal accounts of pain in other patients from excessive scarring provide no basis for surmising causation in Plaintiff's case. That is especially so because scarring does not invariably cause the problems he describes. Far from it. As Dr. Zimmern explained, TVT works with the body's normal scarring process: "the growth of the—of the scar into the weaves of the mesh" is what "secures the mesh in place." JA3718-19; *see* JA2867.

---

[13] Plaintiff cites "bench-top analyses" performed by Ethicon engineer Gene Kammerer, but those analyses forcibly stretched laser- and machine-cut meshes to 150% of their original length and were designed to *deviate from* conditions in vivo. JA3278-80, JA3417.

Dr. Klosterhalfen's testimony likewise failed to provide evidence sufficient to carry Plaintiff's specific-causation burden.  Dr. Klosterhalfen is not a gynecologist, urologist, or urogynecologist, and never examined Plaintiff or offered any opinions specific to her.  JA2689.  As the court below recognized, "he did not testify at any time that [Plaintiff] experienced these injuries because of small pore mesh."  Directed-Verdict Ruling (JA3858-59). Dr. Klosterhalfen's testimony sheds little to no light even on general causation.  His "effective porosity" opinion is based on calculating the percentage of the area of a mesh that, under a constant force, has a pore size of greater than 1 mm in all directions.  But there are no clinical studies regarding the biocompatibility of that theory.  JA2677.  And he agreed that, unlike the force applied in those calculations, "[n]obody knows … exactly" what the actual force is in the pelvic floor—but whatever it is, the force is "most probably" not constant.  JA2676-77.  His studies involved not the Prolene mesh used in TVT but rather a competitor's mesh called Marlex, and he is not even sure of the pore size of Prolene mesh.  JA2674-75.  He also

conceded that his own study showed that Marlex has a higher inflammatory response than Prolene mesh.  JA2675.[14]

Plaintiff's reliance on Dr. Klinge's testimony does not get her any further.  Dr. Klinge, a former hernia surgeon who is not a pathologist, JA3177-78, never examined Plaintiff or her mesh; he merely used a microscope to view pathology slides.  JA3157, JA3175-77.  Dr. Klinge did not testify to a reasonable degree of medical certainty that "inflammation, scar tissue, and bridging fibrosis" caused *Plaintiff's* alleged pain.  Directed-Verdict Ruling (JA3858).  And any such testimony would be improper, as that is beyond his expertise and was not disclosed before he testified.  *See infra* at 42-45.

Moreover, the portions of Dr. Klinge's testimony that Plaintiff cites are replete with equivocations and disclaimers.  *E.g.*, JA3162-63 (scar tissue

---

[14] And even as Plaintiff says that Dr. Klosterhalfen opined that heavyweight, small-pore meshes can cause scarring, which in turn can cause shrinkage, which can entrap nerves, which then can cause pain, Dr. Klosterhalfen betrays his own opinion in conceding that his analysis of explants showed the "same complications" between heavyweight, small-pore meshes and large-pore, lightweight meshes.  JA2672.  Such inconsistencies cannot support a verdict.  *See Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 470-72 (Tex. 2005).

observed in pathology slide "could" indicate "pain in the tissue"); JA3166
(mesh folding has "increased risk" of pain); JA3169 (contraction of scar
tissue "can result in irritation of these nerve structures"); JA3169 (object in
slide "appears to be" a nerve).  Dr. Klinge's testimony is thus much weaker
than the expert testimony Texas courts have deemed insufficient to
establish causation time and again.  For example, in *Shelton v. Sargent*, the
court affirmed judgment against the plaintiffs because their expert's
testimony that the medical procedure in question "may very well be the
reason for" the alleged injury "is far from the standard of 'reasonable
medical probability.'"  144 S.W.3d 113, 127-28 (Tex. App.—Fort Worth 2004,
pet. denied) (emphasis omitted); *see also, e.g.*, *Ridgway*, 135 S.W.3d at 601
(expert "could say no more than that he 'suspects' the [allegedly defective]
electrical system caused the fire").

Finally, Plaintiff cites Dr. Jordi for the proposition that she satisfied
her burden of proof through testimony about flaking and cracking in her
explanted mesh.  Plaintiff suggests that mesh weight and porosity can
somehow "cause[]" degradation, Pl.'s Br. 31, but there is no such evidence
in the record.  Nor is there evidence that degradation—if it occurs at
all—has clinical significance in general, much less that it caused Plaintiff's

alleged pain in particular. Plaintiff's failure to present evidence that any

degradation was clinically significant scuttles her theory: if a property of

TVT does not have clinical significance, that property cannot make TVT

defective or unreasonably dangerous, *see Lucas*, 696 S.W.2d at 378, nor can it

be a producing cause of Plaintiff's alleged injuries, *see BIC Pen Corp. v.*

*Carter*, 346 S.W.3d 533, 543 (Tex. 2011). In the end, while Dr. Jordi testified

that he saw flaking and cracking in her explanted mesh, supposedly

indicating degradation, JA2944-45, neither he nor anyone else testified that

any degradation injured Plaintiff, as the court below recognized. Directed-

Verdict Ruling (JA3858-60).

None of this testimony, considered on its own or in conjunction with

all other evidence, supports an inference of causation by lay jurors. *See Ins.*

*Co. of N. Am. v. Myers*, 411 S.W.2d 710, 714 (Tex. 1966) (insufficient evidence

of causation because expert "did not state as his medical opinion that the

injury did in fact, or in reasonable medical probability, aggravate or excite

the pre-existing tumor; he stated only the medical possibility that such

could have occurred"); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271

S.W.3d 238, 247 (Tex. 2008) ("'Perhaps' and 'possibly' indicate conjecture,

speculation or mere possibility rather than qualified opinions based on

reasonable medical probability."). Jurors are simply not permitted to fill gaps left open by an absence of expert testimony connecting alleged design defects to a plaintiff's specific injury. *See Ernst*, 296 S.W.3d at 95-96, 99-100 (holding that specific causation requires expert testimony).[15]

Plaintiff accuses the court below of demanding that she "neatly package" testimony "on the ultimate issue" from "a single witness … to explain the flaws in the TVT and how they injured [her]." Pl.'s Br. 28-29. The court did nothing of the kind. It expressly considered whether *all* the evidence, pieced together, satisfied Plaintiff's burden of proof. *See, e.g.,* JA3407-08 (directing parties to submit briefing on "[e]xactly what [Dr. Zimmern] said … [a]nd where do you get from that *and the other evidence*") (emphasis added). The court correctly insisted that the evidence, taken as a whole, include expert proof of both general and specific causation:

> It is not enough for the plaintiff to present evidence on general causation. By this I mean that the plaintiff cannot simply present evidence that the TVT mesh can in general cause

[15] For this reason, Plaintiff's subjective view that her symptoms abated following the explant is insufficient. Her subjective account also falls short because it says nothing about the impact of any alleged design defect to Plaintiff. *See Ernst*, 296 S.W.3d at 99-100.

pain or dyspareunia and ask that the jury infer that a design defect in the TVT caused Miss Lewis's specific injuries.

Proof that a product can cause injuries is insufficient to show that it did cause those injuries in a particular case, in this particular case.

Directed-Verdict Ruling (JA3859). Because Plaintiff "has not presented expert testimony to a reasonable degree of medical certainty or probability that any proven design defect of the TVT" caused her injuries, her claim fails. *Id.* (JA3859-60).

## III. The District Court Acted Within Its Discretion When It Sustained Defendants' Objections to Certain Testimony from Dr. Klinge.

As noted, the court below sustained several of Defendants' objections to testimony from Dr. Klinge. On appeal, Plaintiff challenges the court's exercise of its discretion in limiting Dr. Klinge's testimony. Plaintiff's arguments lack merit.

Plaintiff argues for de novo review of the trial court's evidentiary rulings, asserting that the court limited Dr. Klinge's testimony sua sponte and without explanation. Plaintiff's argument lacks support in law or fact. On the law, Plaintiff's only support is an out-of-circuit decision in which the court weighed the various Rule 403 factors on its own because the trial court "fail[ed] to explain its grounds for denying a Rule 403 objection and its

reasons for doing so [we]re not otherwise apparent." *United States v. Sriyuth*, 98 F.3d 739, 745 n.9 (3d Cir. 1996). This Court has never endorsed such a standard of review for expert testimony. To the contrary, this Court reviews the trial court's evidentiary rulings under an abuse of discretion standard. *Davis*, 690 F.3d at 257.

On the facts, Plaintiff's account does not square with the record. The papers and proceedings below show the grounds for Defendants' extensive objections to Dr. Klinge's testimony, grounds that the parties and the court well understood both before and during Dr. Klinge's testimony. Before he testified, Defendants challenged Dr. Klinge's (1) qualifications to give pathology opinions, (2) competence to render opinions regarding pelvic floor and SUI issues based on his experience as a hernia surgeon, and (3) intention to render opinions based on reviewing Plaintiff's pathology slides from the witness stand without having previously disclosed such opinions. JA410, JA3121-23. Those issues were raised again via objections (including a continuing objection) and sidebars throughout his direct examination. JA3142-47, JA3149-51, JA3154-57, JA3160-62, JA3164-67. And they were raised once more when, days later, Plaintiff attempted to proffer Dr. Klinge's hypothetical answers to unasked questions on other issues.

JA3815-18.[16]  At no time did the court on its own "lodge[]" any "objection[s] for the defense."  Pl.'s Br. 44-46; *see* JA3174-75 (sustaining objection previously raised and striking answer).[17]

Nor did the court below err in the few instances when it limited Dr. Klinge's testimony.  Plaintiff argues that Dr. Klinge should have been allowed to opine whether "these entrapped nerves in this [pathology] slide indicate—would indicate chronic pain for Ms. Lewis."  JA3170-71.  But Dr. Klinge's expertise was only in hernia and other abdominal surgery, JA3127-28, so any opinions he offered regarding pelvic-floor repair with SUI meshes were beyond his expertise and lacked an evidentiary basis.

Plaintiff also takes issue with the court's decision to strike Dr. Klinge's answer to the question of whether the pathology slides of Plaintiff's explant "would relate to any complications of pain in Ms. Lewis."  JA3172-73.  The

---

[16] That proffer "relate[d] specifically to [the court's] exclusion of" Dr. Klinge's analysis of other explants.  JA2450-51, JA3814-18.  Plaintiff has not challenged that ruling on appeal.

[17] Plaintiff also complains that the court should have permitted a follow-up question that "may have clarified the response," Pl.'s Br. 47, but her counsel declined to ask any such follow-up question on direct or redirect examination.  She cannot show prejudice by speculating about what answer Dr. Klinge "may have" given to an unasked—indeed, as-yet unarticulated—question.

lower court allowed Dr. Klinge to respond to that question only after cautioning the jury that "in order for an expert witness to say [that one thing was caused by another], they must hold that opinion based on sufficient expertise or say that it is to a reasonable degree of medical certainty, and be qualified to do so in their field." JA3170. After Dr. Klinge began to answer and clearly strayed well beyond his expertise, the court sustained Defendants' objection and struck the testimony. JA3173. The court likewise struck Dr. Klinge's testimony that nerve entrapment and scarring supposedly seen in pathology slides from Plaintiff's explant "can very good explain the manifestation of pain." JA3174.

None of these evidentiary rulings was erroneous. The testimony struck by the court was beyond Dr. Klinge's expertise. Pathology is its own branch of medicine replete with specific board examinations, residency programs, fellowships, certifications, professional societies, and has many highly technical subspecialties. JA3177; *see also* Dorland's Illustrated Medical Dictionary 1396-97 (32d ed. 2012); *Kyser v. Harrison*, 908 So. 2d 914, 919 (Ala. 2005) (forensic pathologist not qualified to render pediatric pathology opinions). Dr. Klinge is a former hernia surgeon; he is not a pathologist, did not complete a residency or fellowship in pathology, and is

not board-certified in pathology. JA385, JA3127-28, JA3177. The hospital where Dr. Klinge works does not even permit him to sign pathology reports. JA385, JA3178. In addition, Dr. Klinge has never performed surgery to treat SUI, studied complication rates of SUI mesh devices, or attempted to collect or study mesh explants from SUI patients. JA3184. Dr. Klinge also conceded that the pathologist who examined slides of Plaintiff's explant did not identify excessive scarring, nerve entrapment, or loose particles. JA3179.

Dr. Klinge is thus in no way qualified to opine on specific causation in a SUI case based on viewing pathology slides. *See Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1357 (M.D. Ga. 2009) (emergency-room physician not qualified to testify regarding pathology issues because he lacked pathology training and could not render such opinions in ordinary medical practice); *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1310, 1314-16 (N.D. Okla. 2000) (family-medicine physician not qualified to opine that medical device caused excessive scarring and foreign body reaction); *Kyser*, 908 So. 2d at 919. The fact that Dr. Klinge works with pathologists in his practice "only reinforces the conclusion that [he] himself lacks sufficient expertise to opine on pathological issues." *In re Diet Drugs Prods. Liab. Litig.*, 2001 WL 454586,

- 44 -

at *17 (E.D. Pa. 2001) (cardiac surgeon not qualified "to render opinions about the epidemiologic, pathologic or pharmacologic significance and implications of" fibrosis supposedly seen in pathology slides).

Moreover, the opinions subject to the court's ruling were never disclosed to Defendants.  Specifically, Dr. Klinge's expert report (JA221-311) did not disclose any specific-causation opinions based upon reasonable medical certainty, and he should not have been permitted to ambush Defendants with belatedly formed causation opinions first divulged on the witness stand.  Before trial, the court observed that "[a]lthough Ethicon asserts that Dr. Klinge's specific causation opinion should be excluded, he offers none on this topic in his report."  JA2206 n.2; *see* JA3149-50.  Because Dr. Klinge disclosed no specific-causation opinions, Fed. R. Civ. P. 26(a)(2)(B)(i), they were correctly barred when Plaintiff tried to elicit them at trial.  *See* Fed. R. Civ. P. 37(c)(1); *S. States*, 318 F.3d at 596-99; *Licciardi v. TIG Ins. Group*, 140 F.3d 357, 358, 363-66 (1st Cir. 1998).

Finally, even if this Court were to believe that the decision to strike certain testimony was an abuse of discretion, the error would not be grounds for reversal because Plaintiff was not prejudiced.  As explained, Dr. Klinge's testimony is no stronger than the conjecture and hypotheses

that Texas courts have routinely found insufficient to show causation.  *See*

*Ridgway*, 135 S.W.3d at 601; *Myers*, 411 S.W.2d at 714; *Shelton*, 144 S.W.3d at

127-28.[18]  For all of these reasons, the court did not err when it excluded

certain testimony from Dr. Klinge.

## IV.    The District Court Correctly Ruled that Texas Common Law Requires Plaintiff to Prove a Safer Alternative Design to TVT.

The court below correctly held that Texas common law required

Plaintiff to prove a safer alternative design.  JA2460-65.  While the trial

court's dispositive decisions did not depend on this holding, Plaintiff has

raised it as a separate point of error on appeal.  *See* Pl.'s Br. 56-65.

Accordingly, if the Court were to conclude that a remand is necessary to

dispose of Plaintiff's design-defect claim, judicial economy favors first

resolving the pure legal question of whether Texas common law requires

Plaintiff to prove a safer alternative design to TVT.[19]

---

[18] Plaintiff emphasizes that Dr. Klinge's native language is not English, *see* Pl.'s Br. 45, but neither he nor Plaintiff's counsel requested the assistance of a translator or otherwise suggested that such assistance might be needed.

[19] This section does not address other, fact-intensive grounds for judgment raised in Ethicon's directed-verdict papers that the court declined to reach, JA3860, namely, that Plaintiff's claims are time-barred and that she presented insufficient evidence on the other elements of her design-defect claim, JA4969-71.  In the event this Court does not affirm the judgment

Plaintiff argues that when § 82.005 was enacted, Texas common law did not require a design-defect plaintiff to prove a safer alternative design. Pl.'s Br. 58.  Plaintiff insists that because § 82.005 includes such a requirement in subsection (a) yet excludes drug and medical device manufacturers from the statutory provision as a whole, *see* § 82.005(d), she should not be required to prove a safer alternative design.  Pl.'s Br. 61-62. There are two major problems with Plaintiff's argument:  first, Texas common law did require proof of a safer alternative design when § 82.005 was enacted; and second, the Texas Legislature did not intend to eliminate the common-law requirement by enacting the statute.

The Texas Supreme Court has unequivocally and repeatedly ruled that, under the common law that governs this case and over which that court is sovereign, "if there are no safer alternatives, a product is not

---

below, those issues will be appropriate for the district court to resolve in the first instance.  *E.g.*, *U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 183-84 (4th Cir. 2013).  Nor does this section address Defendants' directed-verdict arguments that, if accepted, would not justify full affirmance given the case's procedural posture, namely, that Plaintiff's design-defect claim is preempted in part by federal law, that Defendants are entitled to state-law presumptions against liability, and that Defendants are immune from punitive damages.  JA4971-72.

unreasonably dangerous as a matter of law." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995). *Caterpillar* "applied the common law as it existed prior to the enactment of section 82.005" because the claim there accrued in 1988. JA2463. The *Caterpillar* court was obliged to apply pre-1993 common law by the legislation containing § 82.005, which states that § 82.005 "appl[ies] only to a cause of action that accrues on or after" September 1, 1993, and that an earlier-accruing claim "is governed by the law in effect at the time the action accrued, and that law is continued in effect for that purpose." Acts 1993, 73rd Leg., ch. 5, §§ 3(b), 4. For that reason, *Caterpillar* nowhere even mentions § 82.005.

The court below recognized that "*Caterpillar* … is dispositive here." JA2463. Since *Caterpillar* was decided, the Texas Supreme Court has repeatedly held that the common law requires proof of a safer alternative design. *E.g.*, *Hernandez*, 2 S.W.3d at 258; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 n.4 (Tex. 1998); *Grinnell*, 951 S.W.2d at 433. Every post-*Caterpillar* case arising under Texas law involving drugs and medical devices has held that a design-defect plaintiff must prove a safer alternative design. *E.g.*, *Brockert v. Wyeth Pharms., Inc.*, 287 S.W.3d 760, 769 (Tex. App.—Houston 2009, no pet.); *Merck & Co., Inc. v. Garza*, 277 S.W.3d

430, 440 (Tex. App.—San Antonio 2008), *rev'd on other grounds*, 347 S.W.3d 256 (Tex. 2011); *Rojas v. Teva Pharm. USA, Inc.*, 920 F. Supp. 2d 772, 779 (S.D. Tex. 2013); *Gerber v. Hoffman-La Roche, Inc.*, 392 F. Supp. 2d 907, 922 (S.D. Tex. 2005); *Dyer v. Danek Med. Inc.*, 115 F. Supp. 2d 732, 738 (N.D. Tex. 2000).

Sitting in diversity, this Court should not be the first to break with this consensus. *See Harbor Court Assocs. v. Leo A. Daly Co.*, 179 F.3d 147, 153 (4th Cir. 1999). That is especially so because the legislature is content with these decisions, having chosen not to amend § 82.005 in the face of these decisions even as it has added new sections to the statute and amended others. *See Overshown v. State*, 329 S.W.3d 201, 207 (Tex. App.—Houston 2010, no pet.).

Plaintiff's argument that this Court should read § 82.005(d) as eliminating the requirement that she prove a safer alternative design is also inconsistent with the statute itself. Plaintiff argues that because § 82.005(a) requires proof of a safer alternative design, but subsection (d) states that "[t]his section does not apply" to cases involving drugs or medical devices, a plaintiff alleging a design defect in a medical device is "exempt … from the *requirement* to prove a safer alternative design." Pl.'s Br. 57 (emphasis added). The statute says no such thing. And the very next subsection of

that statute, conspicuously missing from Plaintiff's excerpt, expressly

disavows her inference:

> This section is not declarative, *by implication or otherwise*, of the common law with respect to *any product* and shall not be construed to restrict the courts of this state in developing the common law with respect to *any product which is not subject to this section*.

§ 82.005(e) (emphases added).

As the court below held, "the statute does not change or supplant the

common law" or preclude its "develop[ment]" as to products "not subject

to this section" such as drugs and medical devices.  JA2461-62.  And the

common law — as declared by the Texas Supreme Court before and since

§ 82.005 became effective in 1993 — requires proof of a safer alternative

design.[20]  The only authorities Plaintiff cites for her position, a student note

and a practice guide, are unpersuasive.  The note predates *Caterpillar* and

cites no cases to support its tentative view.  The practice guide contains no

---

[20] The common-law safer-alternative-design test is no less demanding than the statutory test set forth in § 82.005(b).  *See Uniroyal*, 977 S.W.2d at 335 n.3 (stating that legislature, in enacting § 82.005, "recently codified the 'reasonably safe alternative' requirement"); *see also Hernandez*, 2 S.W.3d at 258; *Conklin v. Novartis Pharms. Corp.*, 2012 WL 4127301, at *4 n.8 (E.D. Tex. 2012) ("[T]he court has found no prescription drug design defect case in Texas that looks to anything other than Section 82.005 to define what a 'safe alternative design' is.").

analysis or citations.  Both ignore § 82.005(e).  And no cases have cited either the note or the practice guide for the proposition that subsection (d) somehow exempts drug and medical-device claimants from this generally applicable requirement.  This Court should afford them no weight.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Dated:  July 14, 2014                    Respectfully submitted,


/s/ Charles C. Lifland
CHARLES C. LIFLAND
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, California  90071
(213) 430-6000

STEPHEN D. BRODY
DAVID K. ROBERTS
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C.  20006
(202) 383-5300

CHRISTY D. JONES
BUTLER SNOW LLP
1020 Highland Colony Parkway
Suite 1400
Ridgeland, Mississippi 39157
(601) 985-4523

DAVID B. THOMAS
PHILIP J. COMBS
THOMAS COMBS & SPANN, PLLC
P.O. Box 3824
Charleston, West Virginia 25338
(304) 414-1800

*Counsel for Defendants-Appellees*
*Johnson & Johnson and Ethicon, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 10,640 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Book Antiqua 14-point font.

Dated:  July 14, 2014          /s/ Charles C. Lifland
                               Charles C. Lifland

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of July, 2014, the foregoing was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, and counsel for Plaintiff-Appellant will be served by the appellate CM/ECF system. Hard copies of the foregoing are being sent to the clerk and to all counsel of record by Federal Express this same date.

Dated:  July 14, 2014                 /s/ Charles C. Lifland
                                      Charles C. Lifland